BUCKLEY NURSING HOME, INC. *vs.* MASSACHUSETTS
COMMISSION AGAINST DISCRIMINATION;
LORRAINE YOUNG,[1] intervener.

Hampden. April 8, 1985. — June 3, 1985.

Present: GREANEY, C.J., PERRETTA, & SMITH, JJ.

*Anti-Discrimination Law*, Prima facie case, Burden of proof, Damages.
*Administrative Law*, Substantial evidence. *Damages*, Under anti-
discrimination law, Emotional distress, Mitigation.

In a proceeding before the Massachusetts Commission Against Discrimina-
tion, brought by an unsuccessful applicant for employment in a nursing
home, evidence tending to prove that the applicant was treated differently
from other prospective employees and that the employer's standard prac-
tices were not followed in her case because of her race, when considered
with statistical proof that during the relevant time period the employer
had an extremely low percentage of minority employees, was sufficient
to support the commission's conclusion that the employer's explanation
for not hiring the applicant, a black woman, was merely a pretext for
unlawful racial discrimination. [175-179]

In a proceeding before the Massachusetts Commission Against Discrimina-
tion, in which racial discrimination in hiring was alleged, the hearing
Commissioner was justified in finding that the arguably superior qualifi-
cations of two other applicants for employment in a nursing home were
not the reasons that the complainant was not hired, but were merely a
rationalization for a racially motivated decision by the nursing home
operator. [179-181]

In an employment discrimination proceeding before the Massachusetts Com-
mission Against Discrimination, an award of $2,000 as damages for
emotional distress was authorized by G. L. c. 151B, § 5, and was
supported by substantial evidence. [181-183]

In awarding damages to the complainant in an employment discrimination
proceeding, the Massachusetts Commission Against Discrimination was
not required to offset the employee's welfare benefits from her award
of back pay. [183-184]

---

[1] Lorraine Young, the complainant in the original proceedings before the
commission, was granted leave to intervene, pursuant to G. L. c. 30A,
§ 14(2), in Buckley's petition for review in the Superior Court.

A determination by the Massachusetts Commission Against Discrimination of the date by which a complainant could reasonably have been expected to find employment was within permissible limits based on the evidence as to the appropriate geographical area in which she could be required to seek work, and as to the availability of positions comparable to the one for which her application had been unlawfully rejected. [185-187]

CIVIL ACTION commenced in the Superior Court Department on December 16, 1982.

The case was heard by *Elizabeth A. Porada*, J.

*Jay M. Presser (Elaine M. Reall* with him) for the plaintiff.

*Margaret L. Dale* for the defendant.

*Patrick J. Ward* for the intervener.

GREANEY, C.J. On August 27, 1974, Lorraine Young, a black woman, filed a complaint with the Massachusetts Commission Against Discrimination (commission), alleging that, because of her race, she had not been hired as a nurse's aide by Buckley Nursing Home, Inc. (Buckley), in violation of G. L. c. 151B, § 4(1). After attempts at conciliation failed, the case was heard by a single Commissioner who, in a decision dated June 27, 1980, found that Buckley had discriminated against Young. The Commissioner ordered Buckley to pay Young damages in the amount of $6,986 (plus interest) for lost wages and $2,000 for emotional distress, and to develop a minority recruitment program. On November 12, 1982, the full commission made modifications to the single Commissioner's decision and affirmed his decision as modified. A judge of the Superior Court reviewed and upheld the commission's decision.[2] Buckley has appealed.

The facts, as found by the single Commissioner and modified by the full commission, may be summarized as follows. Buckley operates a nursing home in Holyoke. On February 27 and 28 and March 1, 1974, Buckley ran advertisements in a local

---

[2] The extraordinary delay (eight years) in the resolution of the case at the commission level is regrettable. We do not know the reasons for the delay. Whatever they were, we would hope that steps have been taken to rectify them. If there is any case where the rights of the parties should be promptly determined, it is a case arising under G. L. c. 151B.

newspaper for the position of a nurse's aide on the evening (3:00 P.M. to 11:00 P.M.) shift. Young read the advertisement and decided to apply for the position. On March 1, 1984, Young went to Buckley, completed an application form,[3] and was interviewed by the acting supervisor of nurses. At the conclusion of the interviews, the acting supervisor told Young that she would be called when and if there were any available positions. In keeping with her usual practice, the acting supervisor placed Young's application in a stack on the desk of the nursing home administrator.

Another applicant, who had applied in response to an earlier advertisement, was hired for the advertised position on March 1, 1974, and started work on March 4, 1974. During the week of March 4, Young called the nursing home twice and asked to speak to the acting supervisor who had interviewed her. Although she could not identify the person with whom she spoke, she was told that the person who was leaving had asked to work for another week, so the position would not be filled until the following week. Young called the nursing home again the following week and was told that the position had been filled.

From April 12 through April 15, 1974, Buckley ran another advertisement for nurse's aides for the evening shift. Young called in response to that advertisement, spoke to the director of nurses, and was told that her application was on file and that she would be called as needed. No one from Buckley ever made contact with Young.

From March 1, 1974, through July 1, 1974, Buckley hired four full-time and one part-time nurse's aides for the evening shift. On the upper right hand corner of Young's application, there is a hand-written notation "no openings," even though during the relevant time periods there were openings and other persons were hired for the evening shift. That notation does not

---

[3] The single Commissioner found that on her application form, Young listed her education as "Westland High, graduated in 1950, in nursing; Mehar[r]y Medical College, attended in 1956 in nursing; and 'Northeastern University,' certified in 1967." For job experience, Young listed her employment at the time of the application as a nurse's assistant at Holyoke High School.

appear on any other application, and none of Buckley's witnesses could identify who wrote it or when it appeared.

The standard practice which Buckley followed in selecting nurse's aides was as follows. After an applicant was interviewed, her written application was placed in a stack on the desk of the nursing home's administrator. When an opening became available, the administrator looked through the applications and chose the applicant he considered best qualified in relation to the other applicants available at the time. Newspaper advertisements were run periodically to replenish the supply of available applicants.

That procedure was not followed with respect to Young's application. Despite testimony to the contrary, the commission found that there was discussion about Young's race and that Buckley decided not to hire her on that basis. To camouflage their position, nursing home personnel first told Young that the position would not be filled for a week, and then, when she persisted, decided to tell her that there were no openings and made that notation on the front of the application as a reminder. The commission thus concluded that Buckley's asserted reason for not hiring Young (that she was not the best qualified applicant for the job) was a pretext and that she would have been hired but for her race.

Buckley argues three principal issues: (1) that particular findings important to the commission's decision are not supported by substantial evidence and that the findings, considered as a whole, are inadequate to establish that Buckley's reason for not hiring Young was a pretext; (2) that the commission applied the wrong standard in determining that Buckley's hiring decision was discriminatory; and (3) that the damages awarded were beyond the scope of the commission's authority and were not warranted by the evidence.

1. Under the State Administrative Procedure Act, we must defer to the fact-finding function of the commission where substantial evidence exists to support its findings and there is no other error of law. G. L. c. 30A, § 14(7). *Wheelock College* v. *Massachusetts Commn. Against Discrimination*, 371 Mass.

130, 133 (1976). Substantial evidence is evidence that "a reasonable mind might accept as adequate to support a conclusion." G. L. c. 30A, § 1(6), inserted by St. 1954, c. 681, § 1. *Trustees of Forbes Library* v. *Labor Relations Commn.*, 384 Mass. 559, 568 (1981).

(a) The commission found, contrary to testimony by supervisory personnel at the nursing home and its administrator, that there was discussion in evaluating Young's application about her race and that the discussion influenced the hiring decision. Buckley attacks this finding as unsupported by the evidence.

There was testimony that Young was initially interviewed by the acting supervisor of nurses, who had no authority to make hiring decisions. The director of nursing testified that when the acting supervisor interviewed an applicant, the usual practice was for her (the director of nursing), the acting supervisor, and the nursing home's administrator to discuss the application when it was given to the administrator.

There was evidence tending to show that Young was treated differently from other applicants. When she made a telephone call to ascertain the status of her application, she was told that the job would not be filled for another week when, in fact, another applicant had already been hired and had started work. In response to later telephone calls, Young was told she would be called as needed. The notation "no openings" appeared mysteriously at the top of Young's application, even though all the nursing home personnel responsible for interviewing and hiring denied putting the notation there. That notation did not appear on any other application of the more than forty submitted in evidence. In addition, there was statistical evidence indicating that Buckley, during the relevant time period, had an extremely low percentage of minority employees.[4]

---

[4] In fact, between April 6, 1973, and August 22, 1976, Buckley hired no minority employees. Buckley maintains that the statistical evidence which established that fact should not have been admitted and that the commission should not have taken notice of certain statistical data in the Chicopee-Holyoke area.

In a discriminatory treatment case, statistical evidence may be probative

The commission's finding that Young's race had been discussed in the process of evaluating her employment application, is, in effect, a finding that Buckley's decision not to hire Young was motivated by impermissible factors. "Determinations as to the effect of conduct is essentially a matter of drawing inferences, and an agency's conclusions based on inferences will not be set aside by a reviewing court unless they are unreasonable." *Arthurs* v. *Board of Registration in Medicine,* 383 Mass. 299, 310 (1981). The process of drawing inferences becomes especially important in discrimination cases because hiring personnel will seldom admit that they harbored bias. The existence of a discriminatory motive can be inferred from evidence establishing differences in the treatment of two groups. *Smith College* v. *Massachusetts Commn. Against Discrimination,* 376 Mass. 221, 228 (1978). We think the evidence summarized above was sufficient to support a reasonable inference that the nursing home's rejection of Young occurred after consideration of her race.

(b) We also find support for the commission's finding, now challenged by Buckley, that, at the conclusion of Young's interview with the acting supervisor of nurses, Young was told that she would be called when and if there were any available positions. Young emphatically testified that the acting supervisor said she would call her. The acting supervisor testified that she had told Young that "she would hear from us if we were in need. She was qualified to do the job." [5] The single

on the question of motive to show the presence or absence of discrimination. See *Smith College* v. *Massachusetts Commn. Against Discrimination,* 376 Mass. 221, 228 n.9 (1978). Unlike disparate impact cases, there is no need for formal labor market statistics. In *Springfield Bd. of Police Commrs.* v. *Massachusetts Commn. Against Discrimination,* 375 Mass. 782 (1978), evidence that two black officers on a large municipal police force had been promoted was deemed relevant to the issue of the employer's lack of discriminatory intent in not promoting the plaintiff. Similarly here, the fact that Buckley had no minority employees on its work force at the time when Young applied for the job is relevant to the issue of Buckley's motivation. The labor market statistics which the commission judicially noticed, even if technically objectionable, were not essential to establish the probative value of Buckley's own employment statistics.

[5] The parties argue at some length whether the commission's finding means that Young was told that she would be hired for the nurse's aide

Commissioner credited this testimony and rejected later statements by the acting supervisor which attempted to place her testimony in a different light. That was his prerogative as the fact finder.

(c) Finally, on this aspect of the case, Buckley argues that the subsidiary facts found by the commission are legally insufficient to support its ultimate conclusion that the proffered reason for not hiring Young was a pretext for Buckley's discriminatory actions.

The applicable standards are discussed in the decision in *Wheelock College* v. *Massachusetts Commn. Against Discrimination*, 371 Mass. at 139, and are set forth in the margin.[6]

It is obvious that the single Commissioner disbelieved Buckley's explanation, finding, in substance, that Buckley's standard practice of hiring the applicant it considered best qualified, in relation to other available applicants, was not followed in Young's case because of her race.[7] "To satisfy its burden an em-

position which was open at the time of her interview. Young testified to that effect but later backed away from that testimony. It appears that the single Commissioner carefully framed his finding to reflect his acceptance of only the testimony described above.

[6] The standards are these. If the complainant proves a prima facie case of discrimination (the commission found that Young had, and no one disputes that conclusion) the burden shifts to the employer to produce a lawful explanation for its employment decision, along with credible evidence to show that its stated reason was the real reason. *Wheelock College* v. *Massachusetts Commn. Against Discrimination, supra* at 138. If the employer's explanation "has no reasonable support in the evidence or is wholly disbelieved (and hence is transparently a pretext), the employee should prevail. On the other hand, if the reason given by the employer is the real reason for its action and it is a nondiscriminatory one, even if the commission thinks the employer's action was arbitrary or unwise, the employer has fulfilled its obligation of stating a reason and producing support for the stated reason, thus rebutting the prima facie case." *Id.* at 138-139. The burden then shifts back to the employee to prove, by a preponderance of the evidence, that the employer's facially proper reason was not the real reason for its hiring decision. *Id.* at 139.

[7] In making this finding, the single Commissioner carefully considered all the relevant testimony produced by Buckley to rebut Young's prima facie case, see *Wheelock College* v. *Massachusetts Commn. Against Discrimination*, 371 Mass. at 137, and rejected that testimony on the basis of credibility.

We reject Buckley's argument that the single Commissioner erred in disregarding testimony that Buckley offered a position to Young's daughter

ployer's explanation must consist of not only a nondiscriminatory reason for [its] action, but also credible evidence indicating that the reasons advanced were the real reasons for the action and not merely a pretext for discriminatory conduct. . . . As the finder of fact, the commission has the critical and sensitive function of determining whether the proffered reason is the genuine explanation for the employer's conduct." *School Comm. of Braintree* v. *Massachusetts Commn. Against Discrimination,* 377 Mass. 424, 430 (1979). We think that the evidence of Buckley's treatment of Young's application — including promises of fair consideration, false reasons given to deter her inquiries about job openings, the very incriminating "no openings" legend — is sufficient, when supplemented by the statistical proof, to support the commission's conclusion that Buckley's explanation for not hiring Young was only a pretext for unlawful discrimination.

2. Buckley argues that even if there is substantial evidence establishing that its decision not to hire Young was motivated by discrimination, that decision nevertheless should not be disturbed because Young was not the best qualified applicant for the job and would not have been hired even if she had not been the victim of discrimination. By its argument, Buckley seeks to bring into play the so-called dual motive standard. We agree that that standard is relevant to this case [8] but con-

in 1978 and was prepared to offer a job to Young in 1979, until a reference check proved negative. Although proof of nondiscriminatory treatment is generally admissible to establish lack of discriminatory intent, see *Springfield Bd. of Police Commrs.* v. *Massachusetts Commn. Against Discrimination,* 375 Mass. 782 (1978), the single Commissioner could properly have disregarded the 1978 and 1979 events as too remote from the question whether Buckley discriminated against Young in 1974.

[8] We reject the commission's argument that the dual motive standard does not apply because the commission did not accept Buckley's reason as "real." If the complainant would not have been hired even if she had been white, the complainant has not proved a case of discrimination under G. L. c. 151B, § 4. See *Smith College* v. *Massachusetts Commn. Against Discrimination,* 376 Mass. at 227 n.8. Once the employer has advanced a legitimate reason for its decision, that reason is entitled to consideration under the dual motive standard. See *Trustees of Forbes Library* v. *Labor Relations Commn.,* 384 Mass. at 568 n.6. Read together carefully, the *Smith College* and *Forbes Library* cases expand, to some extend, upon the standards discussed in the *Wheelock College* case.

clude that the single Commissioner properly applied the standard when he determined that "but for" her race Young would have been hired instead of two other applicants, Barbara M. and Monica L.[9] See *Smith College* v. *Massachusetts Commn. Against Discrimination,* 376 Mass. at 227 n.8; *Trustees of Forbes Library* v. *Labor Relations Commn.,* 384 Mass. at 568.

Under the dual motive standard, once the employer has articulated a lawful reason for its hiring decision, the employee bears the burden of persuasion on two distinct points: (1) that the reason was not an actual, independent force in the decision, and (2) that the reason was not supported by the facts. *Trustees of Forbes Library, supra* at 566 n.5, citing *Smith College, supra* at 231-232. We have already concluded in part 1 of this opinion that substantial evidence supports the commission's decision that Young's qualifications did not play a role in Buckley's hiring decision (and thus were not the real reason for the decision). The remaining question is whether Buckley's avowed reason has support in the facts.

The nursing home administrator who made the hiring decisions testified that both Barbara M. and Monica L. had relevant experience preferable to that of Young and were hired for that reason.[10] As to Barbara M., the administrator testified that "her [M.'s] application indicates that she had previously been employed by the Holyoke Hospital as an aide in surgery" and therefore was more appropriately experienced than Young "[b]ecause of the complexity of the work." However, M.'s application does not state that she had been employed as a nurse's aide in surgery, but rather that she had left her job as a nurse's aide because she needed surgery. The administrator's

_____

[9] The full commission struck that part of the single Commissioner's finding which found that in addition to the two women named, Young would have been hired in preference to a third woman, Laura A. for lack of evidence showing that Laura A. had been hired for the evening shift. That part of the finding is not crucial to the outcome of the case and does not vitiate the commission's decision.

[10] Contrary to Buckley's assertions, the comparisons with applicants hired for other shifts did not play a role in the single Commissioner's finding that "relative experience" was not the basis for Buckley's decision. Those comparisons were relevant for the purpose of establishing that Young was not per se unqualified for the job and that people with qualifications similar to Young's were hired by Buckley under its standard hiring practices.

testimony on a critical point involving relative qualifications could therefore have been found to be false. This serious error would likewise call into question the administrator's assessment of Monica L.'s qualifications which, on paper, are roughly comparable to Young's. We think the single Commissioner was justified in finding that "the arguably superior qualifications [of two other applicants] were in fact not the reasons for the selection, but were a *post hoc* rationalization for the racially motivated act." As was noted in the *Trustees of Forbes Library* decision, *supra* at 566 n.5, the *Smith College* case "did not . . . intend to suggest that an employee who successfully proves that the lawful reason was not a motive in the decision, must nevertheless lose if she fails to prove that the reason was inaccurately applied to her. . . . The employer should not be permitted to escape liability by invoking after the fact some defect in the employee's [qualifications]." There is a sufficient basis in the proof before the commission to satisfy the second factor in the dual motive test. As a consequence, the commission's conclusion that Buckley violated G. L. c. 151B, § 4, must be upheld.

3. We reach Buckley's three arguments pertaining to the award of damages.[11] First, Buckley argues that an award of emotional distress damages is not permitted by the statute and, if permitted, the award of $2,000 here was not supported by the evidence. Second, Buckley contends that the commission erred in declining to deduct from the back pay award the amount of welfare benefits which Young had received during the relevant time period. Finally, Buckley claims that the amount of back pay ordered by the commission was erroneous because Young had failed to mitigate damages by seeking other employment or, in the alternative, that the period chosen for calculating back pay was incorrect. We take the arguments in turn.

(a) General Laws c. 151B, § 5, as amended through St. 1976, c. 463, § 3, empowers the commission to "take such affirmative action, including, but not limited to, hiring, reinstatement or upgrading of employees, with or without back

---

[11] Buckley does not challenge the commission's order requiring it to develop a minority recruitment program.

pay . . . as, in the judgment of the commission, will effectuate the purposes of this chapter." In *Bournewood Hosp., Inc.* v. *Massachusetts Commn. Against Discrimination,* 371 Mass. 303, 316 (1976), the Supreme Judicial Court noted that "[t]his language represents a significant delegation of discretion and authority by the Legislature to the administrative agency established to enforce the Commonwealth's anti-discrimination laws." Although the *Bournewood* decision expressly recognized the commission's authority to award emotional distress damages only in an employment discrimination case involving retaliation, we see no reason in justice and logic why it is not equally consistent with the broad grant of discretion and authority given the commission to permit it to award damages for emotional distress in other cases of employment discrimination. See discussion in *Bournewood, supra* at 315-317. See also *Massachusetts Commn. Against Discrimination* v. *Franzaroli,* 357 Mass. 112, 115-116 (1970) (commission's award of emotional distress damages upheld in a housing discrimination case). After all, the deep hurt usually felt by the victim of discrimination is the same no matter what guise the disparate treatment takes. We hold that G. L. c. 151B, § 5, authorized reasonable damages for emotional distress in Young's case.

The *Bournewood* case, *supra,* has further indicated (at 317 n.11) that the standards governing an award of damages for emotional distress in proceedings under G. L. c. 151B are not so stringent as those applicable to actions of tort for the intentional infliction of emotional distress. Indeed, in *Bournewood,* a retaliation case, it was stated (at 317) that "the finding of [discrimination] alone permit[s] the inference of emotional distress as a normal adjunct of the [employer's] actions." It necessarily follows that in c. 151B cases an award of emotional distress damages can be sustained even in the absence of physical injury or psychiatric consultation.

The commission found, based upon extensive testimony by Young, that while she was under severe emotional strain at the time of her application to Buckley because of a serious accident suffered by her daughter, she suffered emotional distress as the result of Buckley's discriminatory treatment. There

was testimony that Young was an intelligent woman who was very deeply committed to improving the housing and employment opportunities of minorities in her community. There was also indication that Young had taken prescription medication to deal with the emotional upset caused her by Buckley's conduct. The award of $2,000 as damages for emotional distress is supported by substantial evidence.

(b) We conclude that the commission acted properly in declining to offset Young's welfare benefits from the back pay award.

"As a general rule, a tortfeasor's liability to an injured person shall not be reduced by the amount of compensation received by the injured person pursuant to an insurance policy . . . . Commonly referred to as the 'collateral source rule,' the doctrine requires that 'the damages . . . must be paid by one who has caused the insured's disability.' *Shea* v. *Rettie,* 287 Mass. 454, 458 (1934). It is based on the rationale that if there is to be a 'windfall,' such benefit should accrue to the injured party rather than to the wrongdoer." *Jones* v. *Wayland,* 374 Mass. 249, 262 (1978).

Although most often applied to benefits paid by insurance, the collateral source rule applies to other kinds of payments or benefits conferred by a source other than the defendant, including welfare benefits. See Restatement (Second) of Torts § 920A comments b and c (1977). In *Shea* v. *Rettie, supra* at 458, the court applied the collateral source rule to disability income payments which the plaintiff, a police officer, was entitled to receive under his employment contract with the city. Because there was no common relationship between the city and the defendant who had caused the plaintiff's injury, the court refused to deduct the disability payments from the plaintiff's damages. *Ibid.* In *Jones* v. *Wayland, supra* at 262, the collateral source rule was held not to apply where the party found liable was not responsible for the injury, or where the party found liable has itself established a fund to be drawn on in the event of its liability to another person. In *Jones,* the town was permitted to deduct from payments made under G. L. c. 41, § 111F, to the plaintiff, a police officer who had been

injured in the line of duty, disability compensation paid to the plaintiff under a health and accident policy provided by the town. Likewise, in *Politano* v. *Selectmen of Nahant,* 12 Mass. App. Ct. 738 (1981), we permitted the town to deduct any welfare benefits which the plaintiff, a disabled police officer, was not required to repay to the Department of Public Welfare because the town had not been responsible for the plaintiff's injury.

We see no reason why the collateral source rule should not be applied in the circumstances of this case. Buckley has an "obligation . . . to make good for all the damage [it] has caused." *Politano* v. *Selectmen of Nahant,* 12 Mass. App. Ct. at 746. Although the failure to deduct benefits may allow Young a double recovery (back pay and welfare),[12] a deduction would allow Buckley to escape full liability for its actions. Under the collateral source rule, barring the exceptions noted above which are not here applicable, the "windfall" ought to fall to the victim rather than the wrongdoer. *Jones* v. *Wayland,* 374 Mass. at 262.[13] Moreover, application of the collateral source rule here is consistent with the commission's broad discretion and authority to fashion appropriate remedies for violations of the statute. G. L. c. 151B, § 5. Indeed, a failure to apply the rule would likely undercut the deterrent effect necessary to the efficient functioning of G. L. c. 151B.[14]

---

[12] On the other hand, some of the benefits paid Young may be recaptured by the Department of Public Welfare and therefore may not represent a windfall. See *Meyers* v. *Director of Div. of Employment Security,* 341 Mass. 79 (1960) (DES entitled to recover unemployment benefits paid despite the fact that the arbitrator deducted the benefits from back pay award). Neither party has raised this possibility, and it is not crucial to our decision of the issue.

[13] The "windfall" in Young's case is not all that it seems. Young has ten children and it appears that a significant portion of her welfare grant went to the aid of those dependent children. See G. L. c. 118, § 2; 106 Code Mass. Regs. § 304.950 (1979).

[14] In view of the resolution of the issue under our State cases, we see no need to examine the Federal authorities brought to our attention by the parties. Those authorities discuss the question of deducting unemployment compensation payments from back pay awards in employment discrimination cases arising under the National Labor Relations Act. It has been suggested

(c) The single Commissioner awarded Young back pay for the period from April 23, 1974 (the date Monica L. was hired), until May 31, 1976 (the date Young became unavailable to work for personal reasons). The commission modified this award, concluding that back pay should terminate as of October 31, 1975, the date, in its view, on which Young could reasonably have expected to find comparable employment had she diligently sought work.

Buckley argues that no back pay should have been awarded, asserting that Young's own testimony establishes that she did not diligently seek alternative employment. If it fails in this argument, Buckley contends that the award should have ended on June 25, 1975, the date the first advertisement appeared for a comparable position in the Holyoke area.

The major flaw in Buckley's arguments arises from its misconception of where the burden of proof lies in a case of this kind on the issue of mitigation. The burden of proof on mitigation is on the employer. *Ryan* v. *Superintendent of Schs. of Quincy,* 374 Mass. 670, 673 (1978). "A former employer meets its burden of proof of 'mitigation of damages' if the former employer proves that (a) one or more discoverable opportunities for comparable employment were available in a location as convenient as, or more convenient than, the place of former employment, (b) the improperly discharged employee unreasonably made no attempt to apply for any such job, and (c) it was reasonably likely that the former employee would obtain one of those comparable jobs." *Black* v. *School Comm. of Malden,* 369 Mass. 657, 661-662 (1976).

The commission properly applied this standard in setting the back pay award. The commission first determined that the appropriate geographical area in which Young was required to

---

that those cases may be relevant to racial discrimination cases in the employment context because the remedies established by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., are based upon those of the NLRA. See *Albemarle Paper Co.* v. *Moody,* 422 U.S. 405, 419 (1975). The Federal cases are collected and discussed in Annot., "Offsetting Unemployment Benefits Received Against Award for Backpay in Employment Discrimination Actions," 66 A.L.R. Fed. 880 (1984). We express no opinion on the application of the collateral source rule to payments of unemployment compensation in a case like the present one.

seek work was the city of Holyoke.[15] That determination is sustainable, based upon the facts that Buckley was located only a block from Young's home and that Young had a reasonable wish to work at a location near her ten children, one of whom had been disabled. The commission did not err in rejecting Buckley's argument that Young should have been required to seek work in Springfield because she had an automobile and drove to Springfield in order to attend college courses. The commission could have found on the evidence pertaining to Young's circumstances that jobs outside Holyoke would not meet the convenience factor of *Black, supra.*[16]

On the issue of comparable positions, Buckley introduced newspaper advertisements covering the period from April 2, 1975, through the end of December, 1979.[17] A number of those were for positions on shifts other than the evening shift, or involved employers outside of Holyoke. The only advertisements for comparable positions within Holyoke were published on June 25, 1975, and October 1, 1975. In addition, Buckley failed to introduce any evidence at all on the reasonable likelihood that Young would have obtained one of those positions.

Keeping in mind that "[t]o require that the former employer prove conclusively that the former employee would have obtained employment in a comparable job would impose an impossible burden on a former employer," *Black* v. *School Comm. of Malden,* 369 Mass. at 662, the commission determined that

---

[15] In making this finding, the commission overruled a more narrow interpretation by the single Commissioner which would have required Young to seek work only at the two other nursing homes located within a few blocks of Young's home.

[16] There was also testimony that Young had applied to two nursing homes in Holyoke during the relevant time period. Buckley argues that Young's search was not diligent enough. Because of the burden of proof on mitigation, Buckley's argument fails. Even if Young had not applied for any job, Buckley would have failed to establish that she could have mitigated damages without proof that comparable positions were available and that Young had a reasonable likelihood of obtaining a job. *Ryan* v. *Superintendent of Schs. of Quincy,* 374 Mass. at 674. That Buckley did not do.

[17] As Buckley totally failed to meet its burden with respect to the period from April 23, 1974 until April 2, 1975, the commission correctly affirmed the award of back pay for that period without further discussion.

Young could reasonably have expected to find employment by November 1, 1975, if she had sought work diligently. That date is necessarily inexact due to Buckley's failure to introduce proof on the issue. However, we believe the date to be within reasonable limits based on the evidence.[18]

*Judgment affirmed.*

---

[18] We reject Buckley's argument that the back pay award should be limited to $420, the amount which Young testified was needed to help pay for surgery for her disabled daughter. There was nothing in the evidence which required a finding that Young would have left the job as soon as she had earned $420.

We also reject Buckley's argument which seeks to exclude a three-month period from the back pay award because of a medical problem suffered by Young. The evidence concerning that problem was inconclusive and contradictory and was apparently ignored (with justification) by the commission.

Finally, we reject Buckley's contention that the award should have been cut off on June 25, 1975, the date the first advertisement for a comparable position appeared in a newspaper. Buckley offered nothing to show that Young could reasonably have obtained that particular position if she had applied for it.