Michael PUTNAM and Maureen Putnam,
Plaintiffs, Appellees,

v.

Steven J. DeROSA, etc., et al.,
Defendants, Appellees,

Triad Finance Corporation,
Defendant, Appellant.

Michael PUTNAM and Maureen Putnam,
Plaintiffs, Appellants,

v.

Steven J. DeROSA, etc., et al.,
Defendants, Appellees.

Michael PUTNAM and Maureen Putnam,
Plaintiffs, Appellees,

v.

Steven J. DeROSA, etc., et al.,
Defendants, Appellees,

Progressive Consumers Federal Credit
Union, Defendant, Appellant.

Michael PUTNAM and Maureen Putnam,
Plaintiffs, Appellees,

v.

Steven J. DeROSA, etc., et al.,
Defendants, Appellees.

Robert Amirault and DeRosa Properties,
Inc., Defendants, Appellants.

Nos. 91–1485, 91–1486, 91–
1578 and 91–1579.

United States Court of Appeals,
First Circuit.

Heard Nov. 7, 1991.

Decided May 6, 1992.

Harvey Weiner with whom Mark C. McCrystal, John J. O'Connor and Peabody & Arnold, Boston, Mass., were on brief for Nat. Credit Union Admin., as Conservator for Progressive Consumers Federal Credit Union.

Joseph T. Papetti, Cambridge, Mass., for Steven J. DeRosa, Christie L. DeRosa, DeRosa Properties, Inc. and Robert Amirault.

Robert E. Keane, Cambridge, Mass., for Triad Finance Corp.

Thomas P. Billings with whom Sally & Fitch, Boston, Mass., was on brief for Michael Putnam and Maureen Putnam.

Before BREYER, Chief Judge, SELYA and CYR, Circuit Judges.

BREYER, Chief Judge.

In December 1986, Michael and Maureen Putnam bought four condominiums in a Newburyport apartment complex as an investment. In July 1989, they sued the sellers and financers. They claimed that the salesman had lied to them about the apartments. And, they asked for rescission, restitution, and damages. The trial court entered a judgment for rescission and restitution, but not for damages. Several of the parties appeal. We affirm the trial court's judgment.

## I

### Background

The following background is relevant to this appeal:

1. *The basic transaction.* In 1986 DeRosa Properties and its officers, Steven and Christie DeRosa, made plans to buy an apartment house, called the Westgate Arms, for $7.4 million. They planned simultaneously to convert the apartments into condominiums and resell them, individually, to private investors. A DeRosa Properties salesman, Robert Amirault, spoke to the Putnams in late 1986 about investing. As a result, the Putnams decided to buy four two-bedroom units. The closing, on both the DeRosa Properties purchase of the Westgate Arms from its previous owner, and the resale of four of its condominium units to the Putnams, took place on December 19, 1986.

2. *The structure of the transactions.* The Putnams borrowed $321,000 of the total $333,000 purchase price from two financers, Progressive Consumers Federal Credit Union ($266,400) and Triad Finance Corporation ($54,600). At the closing, DeRosa Properties arranged for a Trust (called the Westgate Arms Realty Trust) to convey to the Putnams legal title to the property. (DeRosa Properties, or its owners, had created the Trust, with Steven DeRosa as its trustee, solely for the purpose of taking, holding, and reconveying legal title to the Westgate Arms apartments.) In return, Progressive and Triad paid to the Trust the money the Putnams borrowed, and the Putnams paid $12,000 from their own pockets. The Putnams gave Progressive a first mortgage on the apartment condominiums; they gave Triad a second mortgage.

3. *The fraud.* The jury in this case found that Robert Amirault, the salesman, knowingly made material misrepresentations when he convinced the Putnams to invest in the condominiums. No one attacks that finding on this appeal. The record shows that the jury finding could have rested on evidence that Amirault

made one, or more, of the following statements (among others) when he met with the Putnams in November 1986:

1. Amirault said that "Progressive had appraised each of the two-bedroom units at a value of $115,000." Since the offering price per unit was considerably less, the investment was "like buying a dollar for eighty cents."

   In fact, Progressive had never appraised the apartment units.

2. Amirault showed the Putnams a document detailing "projected cash flow" at current and "market" rents.

   In fact, the income the Putnams received was far lower than what the projections implied.

3. Amirault said the apartments were in "good" condition.

   In fact, he had never seen the units, and they needed thousands of dollars worth of repairs and improvements.

4. Amirault said the Attorney General of Massachusetts had reviewed and approved plans for the condominium conversion (including a provision that the seller would "buy back" any units occupied by tenants entitled to special protection) as taking proper legal account of the rights of current apartment tenants. *See* 1983 Mass. Acts ch. 527 (1983); Mass.Gen.L. ch. 183A.

   In fact, the Attorney General had not reviewed those plans.

4. *The lawsuit.* The Putnams brought this lawsuit against the salesman, Robert Amirault; the company that offered the units for sale (DeRosa Properties), and its officers (Steven and Christie DeRosa); the Trust's trustee (Steven DeRosa) who conveyed title to the Putnams; and the financers (Progressive and Triad). The Putnams sued for rescission and restitution under Massachusetts law of fraud. *See, e.g., Briggs v. Carol Cars, Inc.,* 407 Mass. 391, 553 N.E.2d 930, 933 (1990) (action for fraud, deceit); *Powell v. Rasmussen,* 355 Mass. 117, 243 N.E.2d 167, 168–69 (1969) (same); *Cherry v. Crispin,* 346 Mass. 89, 190 N.E.2d 93, 95 (1963) (rescission remedy where misrepresentations induced plaintiffs to buy real estate). They also sued

for damages (and attorneys' fees) under Massachusetts's consumer protection statute, Mass.Gen.L. ch. 93A.

The jury found that Amirault knowingly made false representations and that he was acting as agent for DeRosa Properties, for Progressive, and for Triad when he did so. The trial court, then, ordered rescission of the transaction. It ordered Amirault, DeRosa Properties, Progressive, and Triad, to pay the Putnams about $70,000 restitution (representing the $12,000 down payment, mortgage payments, taxes, fees, repair costs, and other expenses, less rents received from tenants). It denied the Putnams any additional damages.

■ 5. *This appeal.* The Putnams brought this case in a Massachusetts state court. This appeal is unusual, for we are a federal court of appeals and normally do not directly review a state trial court's decision. After the trial court's decision, however, a federal regulatory board (the National Credit Union Administration) became conservator for Progressive. A special statute gives it the right to bring this appeal in federal court. 12 U.S.C. § 1789(a)(2); 28 U.S.C. § 1446. We are to consider the state court's determinations as if a federal district court had made them. *Cf. In re Meyerland Co.,* 910 F.2d 1257, 1262 (5th Cir.1990) (federal appellate court review of state trial court under 12 U.S.C. § 1819(b)(2), Federal Deposit Insurance Corporation statute similar to 12 U.S.C. § 1789); *In re Savers Federal Sav. & Loan Assoc.,* 872 F.2d 963, 966 (11th Cir. 1989) (similar, involving 12 U.S.C. § 1730(k)(1), Federal Savings and Loan Insurance Corporation statute). Having done so, we conclude that all of the appellants' various legal claims lack merit. And, we affirm the judgment of the trial court.

## II

### *Progressive's Appeal*

■ 1. *Evidence of Agency.* Progressive argues that the trial court should not have held Progressive liable for rescission or restitution. It concedes, as it must, that it is liable for harm flowing from the mis-

representations of any of its agents, made with its actual or apparent authority. *See, e.g., De Vaux v. American Home Assurance Co.,* 387 Mass. 814, 444 N.E.2d 355, 358 (1983). But, it argues that there was not sufficient evidence for the jury to find that Amirault was acting as Progressive's agent, with such authority, when he made any of the misrepresentations upon which the jury could have rested its determination of fraud.

■ In our view, however, the record provides sufficient evidentiary support for the jury's finding that Amirault was acting within his actual or apparent authority as Progressive's agent, at least when Amirault told the Putnams (we must assume, falsely) that "Progressive had appraised each of the units at $115,000"—a statement sufficient to support the jury's verdict against Progressive.

The record reveals the following:

1. In November 1986, Progressive sent an employee, Jill Manuel, to a Westgate Arms project meeting with DeRosa Properties salesmen, held at DeRosa Properties' office.

2. Manuel distributed Progressive loan applications to Amirault and the other salesmen, instructing the salesmen to give prospective investors the loan application forms. She explained how to fill them out.

3. Amirault later gave an application form to the Putnams. He took back the completed form, and he gave it to DeRosa Properties, which sent it to Progressive. He told the Putnams that Progressive had approved their application, and Progressive later sent the Putnams a confirming letter.

4. Progressive used only DeRosa Properties salesmen to solicit mortgage applications from prospective Westgate Arms investors.

5. Progressive also charged the Putnams, at their closing, $600 for appraising the apartments.

A jury could readily infer from these facts that Amirault was Progressive's agent for soliciting the Putnams' mortgage application, for it could find that Progres-

sive "manifest[ed] ... consent" to Amirault that he "act on" Progressive's "behalf and be subject to" Progressive's "control" for that purpose. *Kirkpatrick v. Boston Mutual Life Ins. Co.,* 393 Mass. 640, 473 N.E.2d 173, 176 (1985) (quoting *Restatement (Second) of Agency* § 1 (1948)); *cf. Hurley v. Ornsteen,* 311 Mass. 477, 42 N.E.2d 273, 276 (1942) (principal's repeated acquiescence in another's actions on its behalf indicates agency relationship); *Weisman v. Saetz,* 11 Mass.App. 440, 416 N.E.2d 1007, 1008 (1981) (same). That being so, Amirault would seem to have had "actual authority" to tell the Putnams about the appraisal, for an agent normally has "actual authority" to "undertake acts incidental to the transaction" that he is authorized to conduct. *Transurface Carriers, Inc. v. Ford Motor Co.,* 738 F.2d 42, 45 (1st Cir.1984); *De Vaux,* 444 N.E.2d at 358; *Costonis v. Medford Housing Authority,* 343 Mass. 108, 176 N.E.2d 25, 29 (1961). Regardless, Amirault had "apparent authority" to talk about Progressive's appraisal, for Progressive's actions in cloaking Amirault with the actual authority to solicit a mortgage application amount to "conduct by the principal [namely, Progressive] which causes a third person [namely, the Putnams] reasonably to believe that a particular person [namely, Amirault] has authority to make [related] representations as his agent." *Veranda Beach Club Ltd. Partnership v. Western Surety Co.,* 936 F.2d 1364, 1377 (1st Cir.1991) (citing *Hudson v. Massachusetts Property Ins. Underwriting Ass'n,* 386 Mass. 450, 436 N.E.2d 155, 159 (1982)); *Binkley Co. v. Eastern Tank, Inc.,* 831 F.2d 333, 337 (1st Cir.1987); *De Vaux,* 444 N.E.2d at 358. After all, one could reasonably expect that a salesman seeking a mortgage application would have authority to describe the lender's appraisal of the property.

A jury finding that Amirault had actual or apparent authority to talk about the appraisal as he did makes Progressive responsible for his materially false statements, statements sufficient to support the jury's finding of fraud and the court's award of rescission and restitution. *Cf.*

*Briggs,* 553 N.E.2d at 932–33; *Yorke v. Taylor,* 332 Mass. 368, 124 N.E.2d 912, 914–15 (1955); *Piper v. Childs,* 290 Mass. 560, 195 N.E. 763 (1935).

2. *Indemnity.* Progressive, noting that Amirault acted both as DeRosa Properties' agent and as Progressive's agent, says that the court should have ordered DeRosa Properties to indemnify it for the "amount [of] . . . any judgment . . . enter[ed] against Progressive in this action." The relevant principles of law, however, indicate that indemnification is not appropriate.

■ Progressive argues that DeRosa Properties must indemnify Progressive because Amirault, in making the misrepresentations for which Progressive and DeRosa Properties are liable, was the common agent of both. But, the *Restatement (Second) of Agency* § 317A (1958), in discussing indemnification and contribution among principals indicates that courts follow the principles set forth in the *Restatement of Restitution,* which sets forth the following, relevant "black letter" law:

> Where two persons were liable in tort for an injury resulting from the conduct of a third person . . . and one of them made reasonable expenditures for the discharge of the liability, he is entitled to indemnity from the other therefor, *if he was without fault and if . . . the other . . . was as between them primarily responsible for the conduct. . . ."*

*Restatement of Restitution* § 98 (1937) (emphasis added); *Elzea v. Hammack,* 241 Mo.App. 1070, 244 S.W.2d 594, 604 (1951) (realty company not entitled to indemnity from its salesman's three associates, who were sellers of the property, where salesman, as agent of both realty company and the sellers, defrauded plaintiff-purchasers, because realty company's and sellers' "responsibility . . . was of equal grade and similar character" and was only "vicarious"); *see also Dennler v. Dodge Transfer Corp.,* 201 F.Supp. 431, 438–44 (D.Conn.1962). As this court has previously explained, the Massachusetts law governing indemnification among joint tortfeasors requires indemnification only where a contract expressly provides for indemnification, where the "nature of the relationship between the parties" requires implying such a contract, or where the role of one party, but not the other, was purely passive. *Araujo v. Wood's Hole, Martha's Vineyard, Nantucket S.S. Authority,* 693 F.2d 1, 2–3 (1st Cir.1982); *see also Garbincius v. Boston Edison Co.,* 621 F.2d 1171, 1176 (1st Cir.1980); *Stewart v. Roy Bros.,* 358 Mass. 446, 265 N.E.2d 357, 364–66 (1970).

In this case, the evidence suggests that Progressive and DeRosa Properties acted similarly. When compared to DeRosa Properties, Progressive was not "without fault," nor was Progressive "purely passive." The differences in *degree* of involvement are not sufficient to require indemnification, which, unlike simple contribution (which Progressive did not request and therefore has waived for purposes of its appeal, *cf. Araujo,* 693 F.2d at 2) would relieve Progressive of all financial responsibility for the harm caused by its agent.

■ Progressive also argues that Amirault should indemnify it on the ground that an agent is liable to his principal for the principal's liability arising out of the agent's breach of duty. *See Restatement (Second) of Agency* § 401 & cmt. d; *cf. Kabatchnick v. Hanover–Elm Bldg. Corp.,* 331 Mass. 366, 119 N.E.2d 169, 172 (1954). This general rule, however, contains important, relevant exceptions. A principal is *not* entitled to indemnification where he has "authorized [the agent] to act in the manner in which he acts." *Restatement (Second) of Agency* § 401 cmt. d; *see also Olson v. Thompson,* 273 Minn. 152, 140 N.W.2d 321, 322 (1965). A principal may authorize a tort "advertently or inadvertently," *Restatement (Second) of Agency* § 401 cmt. d, or where "the agent has reason to believe from his principal's conduct that the principal wishes the statement made although untrue," *id.* § 257 cmt. a. Moreover, Massachusetts law requires an agent actively engaged in wrongdoing to indemnify his principal only if the principal is "blameless." *See Elias v. Unisys Corp.,* 410 Mass. 479, 573 N.E.2d 946, 948 (1991); *Karcher v. Burbank,* 303

Mass. 303, 21 N.E.2d 542, 543–44 (1939); *Richmond v. Schuster Express, Inc.*, 16 Mass.App. 989, 454 N.E.2d 494, 496 (1983); *cf. Araujo*, 693 F.2d at 3.

The facts previously set forth, particularly Progressive's having billed the Putnams for an appraisal that was not made, would permit the fact-finder to conclude that Progressive's involvement was active, not "blameless," or that Progressive "advertently or inadvertently" authorized the false statement. Consequently, the law does not require the trial court to order indemnification.

## III

### Triad's Appeal

Triad appeals the court's order requiring the Trust to take back legal title to the Putnams' apartments and to substitute itself (the Trust) for the Putnams as debtor on the notes to Triad. It argues that the order is unlawful because the Trust was "exonerated" in that the jury found that Amirault, the only person it found to have made misrepresentations, was not the Trust's agent.

The short answer to this argument is that whether or not the Trust was "exonerated" or at fault is beside the point. The Trust does not object to the order. The trustee has not appealed. Nor has Triad appealed from the jury's finding that Amirault was acting, in part, as Triad's agent when he made the statements in question. The Trust itself is simply a legal entity that DeRosa Properties and the DeRosas created (with themselves as settlor and trustee) to hold title to and to convey Westgate Arms property. The trial court has equitable power to substitute the Trust, for the Putnams, as debtor on the mortgage notes, in order to restore the *status quo ante*, even if, as a result of its doing so, Triad must accept a different debtor on its note. Indeed, case law indicates that the court would have this power even were Triad *less* directly involved in the transactions, or the effect of the court's order *more* burdensome, than in the case before us. *See, e.g., Gordon v. Burr*, 506 F.2d

1080, 1085 (2d Cir.1974) (rescission order running against brokerage firm, as "partner" of defrauding seller, was proper remedy because "equity requires the wrongdoer to restore the victim to the status quo"); *My Bread Baking Co. v. Cumberland Farms, Inc.*, 353 Mass. 614, 233 N.E.2d 748, 752 (1968) ("court 'need not consider with nicety which of [fraud defendants involved in "confused intermingling of activity"]' ought to be held liable for the act of [one defendant] 'for which the plaintiff deserves payment' ") (citation omitted); *Henry F. Mitchell, Co. v. Fitzgerald*, 353 Mass. 318, 231 N.E.2d 373, 375–76 (1967) ("substance and intent and not form" are "governing considerations" in equity); *Galdi v. Caribbean Sugar Co.*, 327 Mass. 402, 99 N.E.2d 69, 71–72 (1951) (same).

## IV

### The DeRosa Parties' Appeal

1. The DeRosa Parties (DeRosa Properties and Amirault, joining Triad), claim that the trial court should have invoked the doctrine of laches to dismiss the Putnams' suit because the Putnams delayed two and a half years before bringing it. None of the parties raised laches as an affirmative defense, however, and they cannot raise it now. Mass.R.Civ.P. 8(c); Fed.R.Civ.P. 8(c); *Leahy v. Local 1526, A.F.S.C.M.E.*, 399 Mass. 341, 504 N.E.2d 602, 609 (1987); *Swartz v. Clayton*, 327 Mass. 254, 97 N.E.2d 736, 737 (1951). Regardless, the relevant statute of limitations for fraud in Massachusetts is three years, Mass.Gen.L. ch. 260 § 2A, and nothing in the record suggests that the Putnams' two and one half year delay was unreasonable, or that it caused the defendants any harm. *See K–Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 911 (1st Cir.1989) (unreasonable delay and harm to defendants required for laches defense); *Three Sons, Inc. v. Phoenix Ins. Co.*, 357 Mass. 271, 257 N.E.2d 774, 778 (1970) (same); *Srebnick v. Lo–Law Transit Management, Inc.*, 29 Mass.App. 45, 557 N.E.2d 81, 85 (1990) (same).

2. The DeRosa Parties point out that, under Massachusetts law, a party

in a civil case cannot comment to the jury about another party's failure to call a witness who was similarly available to any of the parties, where such comments, in effect, ask the jury to draw an inference adverse to the other party. *See Jensen v. McEldowney,* 341 Mass. 485, 170 N.E.2d 472, 473–74 (1960); *see also Berry v. Stone,* 345 Mass. 752, 189 N.E.2d 852 (1963). They say that the Putnams' counsel made just such an argument, that they objected, and that the trial court erred in refusing to sustain their objection.

The offending statements consist of the following:

And, at this point, we come to an unhappy fact in the case. One that I wish I could tell it was otherwise, but it's not. Somebody didn't tell you the truth, and the issue for you on [the question of whether Amirault or Christie DeRosa made any false statements of fact to the Putnams] is with respect to each of these statements, is who lied to you and didn't tell the truth.

Now, yesterday we had a parade of five minute witnesses, and I'm sure you welcomed the break from our earlier routine as I did. And you heard from a lot of investors, and salesmen, and DeRosa family members, and so forth. *You may have noticed an interesting thing. The defendants didn't call a single investor who dealt with Bob Amirault.*

Yesterday's witnesses, with the exception of Mr. LeBlanc who was called out of turn as part of my case, with that exception, yesterday's witnesses were the family and friends of Chris DeRosa....

The other investors yesterday, do you need to determine whether they told the truth or not. Of course, not. *Nobody who testified yesterday, except for Mr. LeBlanc, dealt with Bob Amirault.*

[Emphasis added.]

We agree with the DeRosa Parties that one *might* understand the underscored phrases, considered by themselves, as making an argument that missing witnesses, namely investors who dealt with Amirault, would likely testify that Amirault did say what the Putnams claimed or that he was not honest in his business dealings. The problem for appellants, however, is that one can *also* reasonably interpret those same phrases, in context, as making a different point, namely as emphasizing the fact that the witnesses who *did* testify for the defendants were *not* persons who had "dealt with Amirault" (*i.e.,* as pointing out what the witnesses who *did* testify did *not* know). Given that plausible interpretation, and the trial court's broad power over argument at trial, we can find no legal error. *See, e.g., Mitchell v. Weaver,* 806 F.2d 300, 302 (1st Cir.1986).

3. The DeRosa Parties argue that the trial court, in calculating the amount of restitution, should have subtracted the value of the federal income tax benefits that the Putnams received during the period they owned the apartments. The court, however, could have classified those benefits, available to the Putnams but (as far as the record reveals) of unknown value to the defendants, as a kind of windfall. Massachusetts law gives the benefits of windfalls to the "injured party rather than to the wrongdoer." *See Jones v. Town of Wayland,* 374 Mass. 249, 373 N.E.2d 199, 207–08 (1978); *Buckley Nursing Home, Inc. v. Mass. Commission Against Discrimination,* 20 Mass.App. 172, 478 N.E.2d 1292, 1299 (1985). The United States Supreme Court has written, in the context of federal securities laws, that courts should give the benefit of federal income tax windfalls to the party that was defrauded. *See Randall v. Loftsgaarden,* 478 U.S. 647, 663, 106 S.Ct. 3143, 3153, 92 L.Ed.2d 525 (1986). We can find no legal error in the trial court's having done so here.

## V

### *The Putnams' Appeal*

The Putnams appeal the aspect of the case that they lost below, namely the court's decision denying them actual and multiple damages and attorneys' fees under the Massachusetts consumer protection statute, Mass.Gen.L. ch. 93A. In trying this claim, the court properly decided "all

aspects of the ... claim," submitting nothing to the jury. *Acushnet Federal Credit Union v. Roderick,* 26 Mass.App. 604, 530 N.E.2d 1243, 1245 (1988). The Putnams argue that the court based its decision on clearly erroneous findings. They say that the evidence required the judge to find that (1) Amirault misrepresented material facts, and (2) those misrepresentations caused them harm.

The judge, however, found that he was "not persuaded" that the misrepresentations "were made." Since what Amirault did or did not say requires a determination of credibility, that would seem to be the end of the matter. *See Wallace Motor Sales, Inc. v. American Motor Sales Corp.,* 780 F.2d 1049, 1066–67 (1st Cir.1985) (judge may make findings of fact independent from jury in case with some claims tried to jury and ch. 93A claim tried to bench).

Regardless, the court also said, as a "finding of law," that, "to the extent the Putnams were injured, they were injured by causes, namely, a declining condominium market and tax changes contributing to the fall of that market, for which the defendants bear no responsibility." *See Mass. Farm Bureau Federation, Inc. v. Blue Cross of Massachusetts, Inc.,* 403 Mass. 722, 532 N.E.2d 660, 665 (1989) (proof of causation required under ch. 93A); *International Fidelity Insurance Co. v. Wilson,* 387 Mass. 841, 443 N.E.2d 1308, 1314 (1983) (same). We cannot say that this fact-based determination is "clearly erroneous." The court's conclusion, denying the Putnams' ch. 93A damages and attorneys' fees claim, was therefore lawful. Fed.R.Civ.P. 52(a); Mass.R.Civ.P. 52(a) ("clearly erroneous" standard of review for court findings of facts); *see also Mechanics Nat'l Bank v. Killeen,* 377 Mass. 100, 384 N.E.2d 1231, 1237 (1979) (ch. 93A provides recovery for harms due to "unfair trade practices," harms not coextensive with common law torts and contract violations); *Heller v. Silverbranch Construction Corp.,* 376 Mass. 621, 382 N.E.2d 1065, 1069–70 (1978) (same); Mass.Gen.L. ch. 93A §§ 9(3), 11 (double to treble damages where defendant acted in "willful and

knowing violation" of ch. 93A's substantive provisions); *id.* §§ 9(4), 11 (attorneys' fees for prevailing plaintiff).

The judgment is

*Affirmed.*