JOLEEN MORRISON & another[1] *vs.* NORTHERN ESSEX
COMMUNITY COLLEGE.

No. 99-P-2024.

Essex. February 14, 2002. - December 19, 2002.

Present: DUFFLY, DREBEN, & TRAINOR, JJ.

*Education,* Public colleges and universities. *Anti-Discrimination Law,* Unfair
educational practice, Sex. *Practice, Civil,* Statute of limitations. *Limita-
tions, Statute of. Words,* "Deliberate indifference."

In a civil action brought by two female athletes, alleging that they were sexu-
ally harassed by their college basketball coach in violation of G. L. c. 151C,
§ 2(*g*), the trial court judge erred in dismissing the plaintiffs' claims of
quid pro quo harassment (namely, that submission to the coach's advances
was a condition of continued participation on a sports team) on the ground
that they were barred by the statute of limitations, where the record
demonstrated that the claims encompassed discrete conduct that occurred
within the applicable three-year limitations period preceding the filing of
the complaint. [792-795]
In a civil action brought by two female athletes, alleging that they were sexu-
ally harassed by their college basketball coach, the trial court judge erred
in dismissing, on statute of limitations grounds, the plaintiffs' claims that
the coach's conduct gave rise to a hostile educational environment in
violation of G. L. c. 151C, § 2(*g*), and § 901(a) of Title IX of the Educa-
tion Amendments of 1972, 20 U.S.C. § 1681(a) (2000), where the record
demonstrated that each plaintiff raised a genuine issue of material fact
regarding whether there was at least one incident of harassment within the
limitations period that was substantially related to earlier events, thus
rendering the claims timely under the continuing violation doctrine.
[795-798]
In a civil action brought by two female athletes against their college, seeking
damages for violations of § 901(a) of Title IX of the Education Amend-
ments of 1972, 20 U.S.C. § 1681(a) (2000) (Title IX), arising out of the
allegedly sexually harassing conduct of their basketball coach, a question
of fact existed whether the college's response to the plaintiffs' complaints
constituted "deliberate indifference" to discrimination, in violation of Title
IX. [798-800]

CIVIL ACTION commenced in the Superior Court Department on
October 9, 1996.

---

[1] Jahayara Santiago.

The case was heard by *Peter F. Brady*, J., on a motion for summary judgment.

*Richard J. Fallon* for the plaintiffs.

*Stephen Dick*, Assistant Attorney General, for the defendant.

DUFFLY, J. Two female athletes, claiming to have been harassed by their basketball coach, Marshall Hess, while they were students attending Northern Essex Community College (college), brought a complaint on October 9, 1996, for monetary damages in Superior Court asserting that the college[2] violated G. L. c. 151C, §§ 1(*e*), 2(*g*), inserted by St. 1986, c. 588, §§ 4, 5, by committing an unfair educational practice, and § 901(a) of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) (2000) (Title IX), by perpetuating a hostile educational environment arising from sexual harassment.

A Superior Court judge entered summary judgment for the college,[3] concluding that the action was barred by the applicable statute of limitations, which he determined to be three years.[4] The plaintiffs appeal from the judgment dismissing their claims.

[2] In addition to the college, the complaint named as defendants John Dimitry, individually and as president of the college; Stephen Fabrucci, individually and as associate dean of the college; and Marshall Hess. The docket shows that claims against Dimitry and Fabrucci were dismissed by court order and that claims against Hess were dismissed by stipulation of the parties. The record does not include copies of the order or stipulation.

[3] In its motion for summary judgment, the college sought dismissal on the grounds that (1) the plaintiffs' claims under G. L. c. 151C and Title IX were barred by the statute of limitations; (2) claims for negligent infliction of emotional distress did not lie because the plaintiffs suffered no physical harm; and (3) the plaintiffs were not entitled to relief under Title IX because the college had no actual knowledge of the harassment.

The count alleging negligent infliction of emotional distress was dismissed on the ground that the plaintiffs made no showing of having "suffered physical harm as a result of Hess's conduct." We note that this requirement has been modified so that a mental distress claim may be established on "enough objective evidence of [emotional] harm to convince a judge that [the] claims present a sufficient likelihood of genuineness to go to trial." *Sullivan* v. *Boston Gas Co.*, 414 Mass. 129, 137-138 (1993). See *Labonte* v. *Hutchins & Wheeler*, 424 Mass. 813, 824 (1997) (finding of discrimination permits inference of emotional distress). The issue has not been argued on appeal.

[4] The plaintiffs do not contest the judge's determination that the applicable limitations period with respect to both causes of action is three years, see G. L. c. 260, § 2A, and we proceed on the assumption that it is. See, e.g., *Legoff* v. *Trustees of Boston Univ.*, 23 F. Supp. 2d 120, 127 (D. Mass 1998) ("[T]here is a strong tradition of viewing discrimination as a 'fundamental

## LEGAL FRAMEWORK

Under G. L. c. 151C, § 2(*g*), it is an unfair educational practice "[t]o sexually harass students in any program or course of study in any educational institution." Section 1(*e*) of c. 151C defines sexual harassment as encompassing the following:

> "any sexual advances, requests for sexual favors and other verbal or physical conduct of a sexual nature when: — (i) submission to or rejection of such advances, requests or conduct is made either explicitly or implicitly a term or condition of the provision of the benefits, privileges or placement services or as a basis for the evaluation of academic achievement; or (ii) such advances, requests or conduct have the purpose or effect of unreasonably interfering with an individual's education by creating an intimidating, hostile, humiliating or sexually offensive educational environment."

Violations of c. 151C are actionable in Superior Court. G. L. c. 214, § 1C.[5,6]

Title IX provides in relevant part that "no person . . . shall, on the basis of sex, be excluded from participation in, be denied

---

injury to the individual rights of a person.' Most actions for discrimination have therefore been governed by the state statute of limitations for personal injuries" [citations omitted]).

[5]Section 1C of c. 214 states as follows: "A person shall have the right to be free from sexual harassment, as defined in chapter one hundred and fifty-one B and one hundred and fifty-one C. The superior court shall have the jurisdiction in equity to enforce this right and to award damages."

[6]We proceed on the assumption that c. 151C permits individuals in the position of the plaintiffs to make a claim for damages or injunctive relief, in the first instance, in the Superior Court. Chapter 151B, which governs unfair employment practices, requires, pursuant to § 9, first par., the exhaustion of administrative remedies before bringing a civil action in that court. That statute states as follows: "As to acts declared unlawful by section four, the procedure provided in this chapter shall, while pending, be exclusive." See *Green* v. *Wyman-Gordon Co.*, 422 Mass. 551, 554-557 (1996). There is a suggestion in c. 151B, § 9, second par., that the requirement of exhausting administrative remedies before bringing a civil action in the Superior Court extends as well to practices made unlawful "under chapter one hundred and fifty-one C, or by any other unlawful practice within the jurisdiction of the commission." There is nothing in c. 151C, however, that refers back to c. 151B. Nor does c. 151C, in contrast to c. 151B, state that the provisions for the filing of sexual harassment claims with the Massachusetts Commission

the benefits of, or be subjected to discrimination under any
education program or activity receiving Federal financial
assistance.'"[7] 20 U.S.C. § 1681(a) (2000). Sexual harassment
can constitute sex discrimination under Title IX.[8] *Franklin* v.
*Gwinnett County Pub. Schs.*, 503 U.S. 60, 75 (1992). Title IX is
enforceable, in State or Federal court,[9] through an implied right
of action for monetary damages. *Gebser* v. *Lago Vista Indep.
Sch. Dist.*, 524 U.S. 274, 281 (1998).

## FACTS

We describe relevant facts contained in the summary judg-
ment record in the light most favorable to the nonmoving party.
*Graham* v. *Quincy Food Serv. Employees Assn. & Hosp. Library
& Pub. Employees Union*, 407 Mass. 601, 603 (1990).

1. *Notice of incidents in the 1980's.* As early as the 1979-
1980 academic year, administrators at the college, including its
president, John Dimitry, were informed that the school's athletic
director and coach, Marshall Hess, gave liquor to underage
students and asked female students for sexual favors. A 1984

---

Against Discrimination (MCAD) are exclusive.

Section 2(*g*) of c. 151C does make it an unfair educational practice for an
educational institution to sexually harass students who are *engaged in a
program or course of study*. However, G. L. c. 151C, § 3(*a*), which describes
the procedure for filing complaints with the MCAD, applies only to "[a]ny
person *seeking admission as a student* to any educational institution, or
enrolled as a student in a vocational training institution" (emphasis supplied).

[7]There is no contention that the college is not a recipient of such funds.

[8]Title IX does not provide an explicit definition of "sexual harassment."
But see *Wills* v. *Brown Univ.*, 184 F.3d 20, 25 (1st Cir. 1999) ("[T]he Supreme
Court has endorsed two different, although related, theories as to how [sexual]
harassment can constitute sex discrimination either in the workplace [Title
VII] or school context [Title IX]. . . . One theory, popularly known as 'quid
pro quo' harassment or discrimination, occurs most often when some benefit
or adverse action, such as change in salary at work or a grade in school, is
made to depend on providing sexual favors to someone in authority; the other
theory, under the rubric 'hostile environment,' applies where the acts of sexual
harassment are sufficiently severe to interfere with the workplace or school
opportunities normally available to the worker or student" [citations omitted]).

[9]See *Yellow Freight Sys., Inc.* v. *Donnelly*, 494 U.S. 820 (1990) (State
courts have concurrent jurisdiction over Title VII suits); *H.M.* v. *Jefferson
County Bd. of Educ.*, 719 So. 2d 793 (Ala. 1998) (applying Title IX in a State
court); *Mosley* v. *Beaumont Indep. Sch. Dist.*, 997 S.W.2d 934 (Tex. Ct. App.
1999) (same).

complaint about Hess prompted the college to formulate policies and procedures to deal with sexual harassment on the college campus. A committee, the "Sexual Harassment Resource Group," was established, and a faculty member, Paula Strangie, was named its contact person. Despite a series of claims that Hess had sexually harassed female athletes, no official action was taken by college administrators until 1987, when Strangie investigated a female athlete's complaint against Hess and reported the results to Dimitry and other college administrators.

In response, the college conducted a further investigation that uncovered the same or similar accusations about Hess as that reported by Strangie. Those allegations included the following: female athletes had been made to feel beholden to Hess for getting them scholarships or playing time; Hess had, during walks or lunches with female students, encouraged them to confide in him about intimate details of their lives, their relationships with boyfriends, and whether or not they had had abortions; he made liquor available to female students, some under the legal age for drinking alcohol; he pulled down their shorts, patted bottoms, and undid bra straps; he walked in on female students in the bathroom in his house; he had them drink liquor out of his mouth; he kissed them; he engaged in sexual intercourse with female students during the frequent trips he organized; and he discussed his vasectomy and made "dirty vasectomy jokes." Women athletes left the team, stopped attending classes, or withdrew from the college in order to avoid continued contact with Hess. Some former students agreed that they would testify about their experiences with Hess. Others declined to testify or provide the names of students who had confided that they had been sexually intimate with Hess, stating either that they believed the relationships to have been consensual or that they were intimidated — Hess had threatened to reveal pictures in which female students appeared naked, apparently taken while they were drunk.

The report resulted in an agreement between Hess and the college that was signed by Hess on March 29, 1988, and by Di-

mitry on April 8, 1988.[10] The agreement stipulated that Hess could "not act as coach for any female athletic teams at the College for the remainder of his employment at the College."[11]

Hess did not coach any female athletic team for the next two and one-half years. In the fall of 1991, the agreement was modified twice: first, to allow Hess to participate in field trips involving female students; and second, following the unexpected resignation of a coach, to permit Hess to function as head coach of the women's basketball team "for the balance of the 1991/1992 season only." Although no further modifications were made to the agreement,[12] Hess continued to coach women's basketball until he was suspended in August, 1994, following the investigation of complaints by the plaintiffs and a third student that he had sexually harassed them.[13]

2. *Conduct directed at the plaintiffs.* a. *Morrison.* Morrison was nineteen years old when she first attended the college in the fall of 1992 and tried out for the women's basketball team. Hess coached the team, and she saw him daily at the gym in connection with her work-study assignment for Hess and on walks they took together. Conversations with Hess were replete with sexual innuendo: he asked Morrison for details about her sex life, a miscarriage, and whether she had had orgasms. Hess

[10]It was also signed by the president of Hess's labor union unit, the Massachusetts Community College Council/Massachusetts Teachers Association, and its attorney.

[11]Under the agreement, Hess was to participate in psychological therapy for at least one year, unless "prior to the completion of [that] year his therapist certifie[d] to the College's satisfaction that Hess require[d] no further therapy, [in which case] such therapy [could] cease." The college agreed to pay for up to one year of the cost of the therapy not covered by insurance. A memorandum noting that Hess had been warned about complaints of sexual harassment was to be placed in Hess's personnel file. That memorandum, however, would be removed from Hess's file and the college would "cease to maintain . . . the investigatory materials relating to prior complaints of sexual harassment" if "there [were] no further complaints or problems involving sexual harassment for a period of 18 months after the completion of psychological therapy."

[12]The record also does not show either that Hess participated in psychological therapy or that a therapist had certified that he did not require further therapy.

[13]The third student, who is not a party to these proceedings, complained that, in the spring of 1991, Hess had invited her to a New Hampshire condominium, insisted on massaging her on the floor, then masturbated in her presence.

would ignore or make fun of Morrison if she failed to respond to his comments.

Hess owned a condominium near the college that he rented to the assistant basketball coach, Donna Johnson, who allowed team members to use her home to relax or have lunch. Sometimes Hess would be there. In February, 1993, Morrison agreed to have lunch with Hess at Johnson's home but, upon arriving, was surprised to find that no one else was there. Morrison massaged Hess's back and legs when he asked her to (he often asked her for massages) but stopped when he asked her to rub his buttocks. Saying it was her turn, Hess untucked Morrison's shirt, undid her bra, and began to massage her back. He then reached around and grabbed her breasts and began to massage them. At the same time, someone drove up, and Hess told Morrison to go to the bathroom and put her bra on. Hess then came to the bathroom door, asked if she had gotten her bra back on, and said, "They seem really big, maybe next time I can see them."

Morrison tried to avoid Hess after that. When he saw her, he made jokes about her breasts. He also told her that, if she had not had an orgasm yet, he would give her one. The comments made her feel "dirty, like it was [her] fault." In May, 1993, Hess bet Morrison that she could not "go all summer without getting it . . . . I bet you lunch when you get back you probably got laid in Dallas." During the first weeks of the 1993 fall semester, Hess asked Morrison if he had won the bet and if Morrison was buying him lunch. A week or two later, during the first or second week of October, 1993, Hess and Morrison had a second conversation during which he asked when she was buying him lunch because he knew that he had won the bet. Thereafter, Morrison avoided conversation with Hess, but when she ran into him, he would ask "when was lunch." Hess's comments made Morrison feel threatened, confused, and pressured.

Morrison did not play basketball during the 1993-1994 season. An excellent softball player, she joined the softball team for the 1994 spring season. Her softball coach was Johnson (who rented Hess's condominium). Whenever Hess appeared at a softball game, Johnson pulled Morrison from the game for no apparent reason. During one home game, Morrison was playing

in the outfield in the second or third inning when Hess appeared. Morrison saw him speak to Johnson, who then pulled Morrison out of the rest of the game.

Sometime in early 1994, Morrison spoke to the college sexual harassment counselor about what had occurred, and thereafter, in February, 1994, she complained to Stephen Fabrucci, the associate dean. She left the college in May, 1994, before completing her degree. Hess's conduct adversely affected Morrison's relationships with other people, particularly male authority figures. She felt ashamed and depressed, and as a result, engaged in treatment with a counselor. On October 9, 1996, Morrison and Santiago filed their complaint.

b. *Santiago*. Santiago arrived at the college in the spring of 1992, but was ineligible to play basketball until the fall. After joining the women's basketball team in the fall of 1992, Hess took Santiago on walks, asking that she tell no one because of what people might say. The conversations grew increasingly personal: he asked questions about her sex life and made fun of her when she referred to sex as "it." Uncomfortable, Santiago began to avoid Hess. Hess was persistent in asking Santiago to find time to go on walks with him. He also told her that he had asked Johnson to invite her to go drinking with them since he couldn't invite her himself because she was only nineteen. He said that he was not trying to "hit on her" and that if he wanted to "fuck" anyone on the team "it would be [another student]."

In late November, 1992, Hess confronted Santiago and asked if she was trying to avoid him. She agreed to have lunch with him and, at Hess's invitation, got into his van. During the drive Hess turned the conversation to movie sex scenes, asked if she had ever had an orgasm, and laughed when Santiago, embarrassed, looked out the window. Hess stopped and bought sandwiches and beer, then continued on, eventually stopping at a condominium complex that Santiago did not recognize. She asked what they were doing there, and Hess said that it was someplace to eat, and that it belonged to him and his wife. Santiago felt frightened but tried to reassure herself. Once inside, she sat on the couch while Hess sat on a bed in the room. They drank beer, and he brought out a bottle of champagne. Hess, now lying on the bed, said, "I want a massage but don't worry,

we don't have to do it. I just want it in your underwear." When Santiago said she did not give massages, Hess told her about another student who had regretted having rejected him. Santiago responded that it "must have been a long time ago," and Hess became insulted, saying she was rejecting him because he was fat. Worried that he might rape or harm her, Santiago was relieved when Hess agreed to take her back to the college.

Thereafter, whenever Hess saw Santiago he alluded to the condominium incident — he would look at her and wink or smirk as he made comments about his weight or efforts to lose weight, or while patting his stomach. Hess began to ridicule her publicly and made comments about her being "lower class."

During the next basketball season, Hess benched Santiago, a team captain, for increasingly longer periods and often yelled at her. On February 5, 1994, he called her to the middle of the gym floor during pregame warm-up. In front of both teams, he told her that he knew she was not getting playing time, that it was his decision, and that, if she did not like it, she could turn in her uniform. He repeated this twice, until she left the gym and quit the team.

Later in February, Santiago complained to Fabrucci that Hess had sexually harassed her. Thereafter, when she encountered Hess alone, he would walk close to her and snicker in a way she experienced as intimidating. He continued making nearly daily suggestive references to his weight until Santiago transferred from the college in May, 1994. As a result of her encounters with Hess, Santiago felt depressed and helpless, blamed herself, and sought counseling. Her relationships with other people were affected, and she experienced flashbacks that left her feeling sad, disgusted, and emotional.

In August, 1994, six months after the plaintiffs complained, the college took steps to suspend Hess. As we have indicated, the plaintiffs filed their complaint in Superior Court on October 9, 1996.

## DISCUSSION

1. *Statute of limitations.* Whether a sexual harassment claim brought under G. L. c. 151C or Title IX is barred by the statute of limitations depends on the claim and on the nature of the viola-

tive conduct — that is, whether the conduct consisted of a "discrete act" or was a "continuing violation."[14] We address the plaintiffs' alternative arguments: that the acts complained of amounted to serial continuing violations, all of which are actionable because the last occurred within the statute of limitations; or, if we conclude that there was no continuing violation, that there was independently actionable conduct that fell within the three-year limitations period. See note 4, *supra.*

Statute of limitations principles in an employment discrimination context, recently articulated by the United States Supreme Court in *National R.R. Passenger Corp.* v. *Morgan,* 536 U.S. 101 (2002) (discussing Title VII[15]), and previously adopted by the Supreme Judicial Court in *Cuddyer* v. *Stop & Shop Supermarket Co.,* 434 Mass. 521 (2001) (discussing G. L. c. 151B), are analogous to claims of sexual harassment in an educational setting. See *Legoff* v. *Trustees of Brown Univ.,* 23 F. Supp. 2d 120, 126 (1998) ("In interpreting Title IX, courts apply the legal principles elaborated under Title VII"). These two cases indicate that the Massachusetts and Federal courts interpret continuing violations of the serial kind in the same manner.[16]

a. *Discrete acts: General Laws c. 151C.* The plaintiffs' claims

---

[14]Federal decisions recognize two kinds of continuing violations: serial and systemic. *Provencher* v. *CVS Pharmacy, Div. of Melville Corp.,* 145 F.3d 5, 14 (1st Cir. 1998). See *Carter* v. *Commissioner of Correction,* 43 Mass. App. Ct. 212, 220 (1997). "[A] systemic violation need not involve an identifiable, discrete act of discrimination transpiring within the limitation period. . . . A systemic violation has its roots in a discriminatory policy or practice; so long as the policy or practice itself continues into the limitation period, a challenger may be deemed to have filed a timely complaint." *Jensen* v. *Frank,* 912 F.2d 517, 522 (1st Cir. 1990).

The college argues that because the plaintiffs' evidence does not establish the existence of an overarching policy or practice directed to female students generally, there is no systemic violation. See, e.g., *Provencher* v. *CVS Pharmacy, Div. of Melville Corp., supra.* In light of our determination that there is a genuine issue of material fact whether serial continuing violations occurred, we need not address the plaintiffs' argument that, by allowing Hess to resume coaching in 1992, the college promulgated a policy that, in effect, promoted sexual harassment of female students.

[15]Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1) (2000).

[16]The Superior Court judge dismissed the c. 151C and Title IX claims, relying primarily on *Provencher* v. *CVS Pharmacy, Div. of Melville Corp., supra* (in Title VII context, "[e]ven where a plaintiff alleges a violation within the

of "quid pro quo" harassment, see *Beaupre* v. *Smith & Assocs.*, 50 Mass. App. Ct. 480, 488 (2000); G. L. c. 151C, § 1(*e*)(i), encompass discrete conduct within the limitations period that establishes a violation under the definition of sexual harassment set forth in c. 151C, § 1(*e*)(i), namely, that submission to Hess's advances was a condition of continued participation on a college sports team. Cf. *Beaupre* v. *Smith & Assocs.*, *supra* at 481 n.4, 488. The violation occurred when it became apparent that submission was the "quid pro quo" of continued participation on a sports team. In the light most favorable to the plaintiffs, that occurred when Hess, responding to the rejection of his advances, caused his assistant coach to pull Morrison from softball games early in the spring of 1994 and forced Santiago's resignation from the basketball team in February, 1994. Cf. *National R.R. Passenger Corp.* v. *Morgan*, 536 U.S. 101 (2002). "Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'. . .[O]nly incidents that took place within the timely filing period are actionable." *Id.* at 114.

These acts (when Morrison was precluded from participating fully on the softball team and Santiago was forced to resign from the basketball team) constituted discrete, independently actionable violations of c. 151C, § 1(*e*)(i), and the limitations period began to run from the date of each act (with respect to Morrison's claim, in the spring of 1994, and with respect to Santiago's claim, in February, 1994). See, e.g., *Davis* v. *Sears, Roebuck & Co.*, 708 F.2d 862, 865 (1st Cir. 1983) (limitations period begins to run on date of notice of discriminatory dismissal); *Davis* v. *Lucent Technologies, Inc.*, 251 F.3d 227, 231 (1st Cir. 2001) (MCAD complaint should have been filed

---

appropriate statute of limitations period, the continuing violation claim . . . fail[s] if the plaintiff was or should have been aware [s]he was being unlawfully discriminated against while earlier acts, now untimely, were taking place"). The motion judge did not have the benefit of the analysis in *Cuddyer* v. *Stop & Shop Supermarket Co.*, *supra*, or *National R.R. Passenger Corp.* v. *Morgan*, *supra*, which disavowed the approach expressed in *Provencher* v. *CVS Pharmacy, Div. of Melville Corp.*, *supra*.

within six months of date of termination to be timely). Because both events took place within the three-year period preceding the filing of the complaint on October 9, 1996, each plaintiff's claim of quid pro quo harassment was timely filed.[17]

b. *Continuing violations (serial): General Laws c. 151C.* The facts we have described establish continuing violations that support the plaintiffs' hostile educational environment claims, viable under G. L. c. 151C, § 1(e)(ii), as well as Title IX. Hostile educational environment claims generally involve continuing violations that "are different in kind from discrete acts. Their very nature involves repeated conduct. . . . The 'unlawful [educational] practice' therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *National R.R. Passenger Corp.* v. *Morgan,* 536 U.S. at 115.

With respect to the hostile educational environment claim under c. 151C, § 1(e)(ii), a jury could conclude that Hess's conduct was experienced by each plaintiff as humiliating and degrading (and would be so experienced by a reasonable person) and was sufficiently pervasive to constitute a hostile educational

---

[17]We do not determine on the record before us whether Santiago and Morrison should have been aware much sooner that rejection of Hess's advances was affecting their playing time, as on the facts of this case, even the earliest such notice was within the limitations period.

We also do not address whether a c. 151C claim against an educational institution requires that its administrators have knowledge of harassment perpetrated by its coaches or teachers, a requirement imposed on claims under Title IX. See *Gebser* v. *Lago Vista Ind. Sch. Dist.,* 524 U.S. 274 (1998). In *Gebser,* the Court concluded that, under Title IX, the "funding recipient" must have actual notice of discriminatory behavior before being required to take remedial action. *Id.* at 288. The Court distinguished between Title IX, which conditions Federal funding on an educational institution's promise not to engage in discriminatory behavior, from Title VII, which creates an outright prohibition against discriminatory behavior. See *id.* at 280-290. The Court also observed that Title IX encompasses an implied private right of action for monetary damages, while Title VII encompasses an explicit private right of action for monetary damages. *Id.* at 286-288. The Court went on to note, "[O]ur decision does not affect any right of recovery that an individual may have against a school district as a matter of state law." *Id.* at 292. See our discussion, *infra,* regarding whether the college was deliberately indifferent.

environment constituting a violation of c. 151C, § 1(*e*)(ii).[18] "[A student] who suffers from recurring acts of abusive sexual verbal or physical conduct that, over time, rise to the level of a hostile [educational] environment, may be unable to appreciate the true character and enormity of the discriminatory environment until after it has continued for an appreciable length of time. A hostile [educational] environment constitutes a *pattern of sexual harassment* . . . that, by its very nature, often is apparent only in hindsight." *Cuddyer* v. *Stop & Shop Supermarket Co.*, 434 Mass. at 538 (emphasis original).[19]

In *Cuddyer*, the plaintiff brought a hostile work environment action under G. L. c. 151B, claiming that she had been sexually harassed by several of her coworkers over a nearly twenty-year period. The court specifically addressed whether "the plaintiff's awareness that she was being sexually harassed by incidents occurring [outside of the applicable limitations period], bars her from asserting a substantive claim in court based on those incidents," *id.* at 530, concluding that it did not.

We think the principles applicable to limitations issues set forth in *Cuddyer* as to a hostile work environment are applicable with equal force in the context of claims of a hostile

---

[18]A jury could reasonably find that, after Hess fondled Morrison's breasts, she began to avoid him, hoping thereby to ward off such advances in the future. When he persisted, throughout the fall of 1994, to tell her that he was owed lunch, the jury could infer that Hess intended to remind Morrison of earlier conversations in which he had asked her, referring to having sex, if she could "go all summer without getting it." In light of his prior sexual assault and the conversations in which Hess had sought details about Morrison's sex life, these allusions took on a sexual nature, the last of which was made within three years of the filing of the complaint.

With respect to Santiago's claims, a jury could likewise find that Hess's comments regarding his weight or efforts to lose weight had a decidedly sexual connotation because they were intended by Hess to, and actually did, bring to Santiago's mind their prior encounters — when Hess, after making sexual advances, stated his belief that Santiago was rebuffing him because of his weight. Although she was not precise about the dates on which these comments were made, a jury could find that they occurred well into the fall of 1993 and thereafter and that the last such comment was made within the relevant three-year period.

[19]The court recognized that "[i]t is also possible to have an actionable hostile work environment claim based on a single act of sexual harassment." *Cuddyer* v. *Stop & Shop Supermarket Co., supra* at 538 n.21.

educational environment brought under c. 151C. These principles are as follows:

> "[A] plaintiff who demonstrates a pattern of sexual harassment that creates a hostile [educational] environment and that includes conduct within the [three-year] statute of limitations, may claim the benefit of the continuing violation doctrine and seek damages for conduct that occurred outside the limitations period . . . ."

*Id.* at 539.

Because the creation of a hostile educational environment may occur through accretion of sexually offensive behavior over time, the most recent incident of conduct (conduct that need not itself be independently actionable) anchors prior, related events for purposes of determining whether the statute of limitations bars suit even though a large portion of the discriminatory conduct may have taken place more than three years prior to the complaint. Cf. *Cuddyer* v. *Stop & Shop Supermarket Co.*, 434 Mass. at 532-533 (plaintiff must show, within limitations period, "the existence of at least one incident of sexual conduct which, standing alone might not necessarily support her claim, but which substantially relates to earlier incidents of abuse, and substantially contributes to the continuation of a hostile work environment, such that the incident anchors all related incidents, thereby making the entirety of the claim for discriminatory conduct timely").

We conclude that for purposes of summary judgment, each plaintiff has raised a genuine issue of material fact regarding whether there was at least one incident of sexual conduct within the limitations period that was substantially related to earlier events. In response, the defendant may show that "the plaintiff knew or reasonably should have known that her [educational] situation was pervasively hostile and unlikely to improve, and, thus, a reasonable person in her position would have filed a complaint . . . before the statute ran on that conduct." *Id.* at 539. Whether such circumstances faced Morrison or Santiago does not appear on this record but may, on appropriate evidence, be presented to the jury.

c. *Title IX claims.* The question of the timeliness of the

plaintiffs' Title IX claims is governed by interpretations of Federal courts. See *Perez* v. *Laredo Jr. College*, 706 F.2d 731, 733 (5th Cir. 1983) (Federal law determines when civil rights action "begins to run"). The determination of whether a hostile environment exists under Title IX, as drawn from analogous principles regarding Title VII, requires an examination of " 'all the circumstances,' including the 'frequency of the [sexually offensive] conduct; its severity; whether it is [intimidating,] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with a [student's educational program or] performance.' [*Harris* v. *Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).] 'Subject to some policing at the outer bounds,' it is for the jury to weigh those factors and decide whether the harassment was of a kind or to a degree that a reasonable person would have felt that it affected the conditions of her [education]." *Marrero* v. *Goya of P.R.*, 304 F.3d 7, 18-19 (1st Cir. 2002), quoting from *Gorski* v. *N.H. Dept. of Corrections*, 290 F.3d 466, 474 (1st Cir. 2002).

With respect to statute of limitations questions, the Supreme Court has held that because a hostile environment claim "is comprised of a series of separate acts that collectively constitute one 'unlawful [educational] practice,'. . . it does not matter . . . that some of the component acts of the hostile [educational] environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *National R.R. Passenger Corp.* v. *Morgan*, 536 U.S. at 117. Relying on the foregoing principles and our preceding discussion, we conclude that the plaintiffs' claims under Title IX were likewise timely filed.

2. *Deliberate indifference.* In *Gebser* v. *Lago Vista Indep. Sch. Dist.*, 524 U.S. at 290, the Supreme Court stated that to recover compensatory damages under Title IX for sexual harassment, a plaintiff must show that "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of the discrimination . . . and fails adequately to respond. . . . [T]he response must amount to deliberate indif-

ference to discrimination." Construing deliberate indifference, the First Circuit has stated that "[i]f the institution makes timely and reasonable measures to end the harassment, it is not liable under Title IX for prior harassment." *Wills* v. *Brown Univ.*, 184 F.3d 20, 26 (1st Cir. 1999). Compare *Franklin* v. *Gwinnett County Pub. Schs.*, 503 U.S. 60 (1992).

The college contends that it did not have notice of Hess's harassment of the plaintiffs until they complained to Fabrucci in February, 1994, thereby precluding recovery under Title IX. It further argues that, even if it was on notice by virtue of having previously been informed that Hess sexually harassed other women at the college during a period spanning nearly two decades, recovery would be precluded because it cannot be said, as matter of law, that the college acted with deliberate indifference. To support this argument, the college points to the fact that, in 1988, it barred Hess from coaching women students and only allowed him to resume coaching in 1991 after having received no further complaints of sexual harassment (during the period he was barred from contact with them).

As to the first prong of its argument, there is evidence in the record from which a fact finder could conclude that top administrators at the college, including its president, had actual knowledge, beginning at least in 1980 and certainly by 1987, that Hess was a sexual predator whose presence on campus posed a serious threat to the well-being of female student athletes. The college provides no citation to any Federal authority, and we have found none, supporting its position that knowledge of acts of sexual harassment against students other than the plaintiff would be insufficient to put the college on notice that Hess would sexually abuse other students, including the plaintiffs. *Gebser* itself does not mandate that notice be of acts against a plaintiff, but only that a recipient school have "actual knowledge of discrimination in the recipient's programs." *Gebser* v. *Lago Vista Ind. Sch. Dist.*, 524 U.S. at 290. The focus is on institutional wrongdoing that derives from a knowing failure to respond to discrimination in its programs. As in the circumstances of this case, such knowledge could derive from having learned that an individual had previously harassed other students. See *Wills* v. *Brown Univ.*, 184 F.3d

at 27 (recognizing that key evidence supporting a claim of deliberate indifference was what university knew and did in response to a prior complaint from a student other than plaintiff). The plaintiffs have raised a genuine issue of material fact as to whether the college acted with deliberate indifference. See *Massey* v. *Akron City Bd. of Educ.*, 82 F. Supp. 2d 735, 745 (N.D. Ohio 2000) (where the board of education received notice of offender's proclivities long before the incidents with the plaintiff occurred, there was a genuine issue whether board had actual knowledge of wrongful conduct and was indifferent to it). Cf. *Doe* v. *Special Sch. Dist. of St. Louis County*, 901 F.2d 642 (8th Cir. 1990).

Whether the college responded reasonably, or with indifference, to the knowledge of Hess's conduct will depend on the circumstances known to the college at the time. Also relevant is whether the decision to allow Hess to resume coaching was reasonable under the circumstances. These are issues which, on this record, cannot be resolved as matter of law but are better left to a jury.

## CONCLUSION

We vacate the grant of summary judgment for the defendant with respect to claimed violations of G. L. c. 151C, § 1, and Title IX and remand the case to Superior Court for further proceedings consistent with this opinion.

*So ordered.*