JUDITH BORNE & others[1] *vs.* HAVERHILL GOLF & COUNTRY CLUB, INC. (and a companion case[2]).

Nos. 00-P-1732 & 01-P-1705.

Suffolk. December 19, 2002. - June 13, 2003.

Present: GREENBERG, KASS, & COHEN, JJ.

*Anti-Discrimination Law,* Sex, Prima facie case, Burden of proof, Damages, Attorney's fees. *Constitutional Law,* Sex discrimination. *Practice, Civil,* Instructions to jury, Directed verdict. *Evidence,* State of mind, Emotional state. *Damages,* Remittitur, Punitive, Attorney's fees. *Injunction. Contempt.*

In a civil action brought by nine female members of a golf and country club for gender-based discrimination in violation of, among other things, G. L. c. 151B, § 4, the trial judge did not err in deciding, rather than putting before the jury as a question of fact, that discriminatory conduct which had occurred outside the six-month statute of limitations period was admissible under the continuing violation doctrine as explicated in *Cuddyer* v. *Stop & Shop Supermarket Co.,* 434 Mass. 521 (2001), where there was undisputed evidence of acts which the jury could find manifested gender discrimination, and those acts had characteristics in common with acts committed within the limitations period, such that it became a question of law for the judge whether the earlier acts could be considered by the jury on the basis of the continuing violation doctrine. [311-313]

In a civil action brought by nine female members of a golf and country club for gender-based discrimination in violation of, among other things, G. L. c. 151B, § 4, the trial judge properly instructed the jury that the ultimate issue in the case was discrimination, and that the jurors were to consider whether the legitimizing reason offered by the defendant was a pretext for "actual discrimination"; the judge's instructions did not, as the opinion in *Lipchitz* v. *Raytheon Co.,* 434 Mass. 493 (2001), found unacceptable, tell the jury that if they found the defendant's legitimizing reason was a pretext, that alone required a finding in the plaintiffs' favor. [313-316]

No reversible error occurred in a civil action brought by nine female members of a golf and country club (club) for gender-based discrimination in violation of, among other things, G. L. c. 151B, § 4, when the judge allowed a

---

[1]Sally Brochetti, Diana Cordner, Pamela Dean, Cindy Johnston, Lorna Kimball, Linda Letendre, Karen Richardson, Maria Torrisi, and Commonwealth of Massachusetts. Another plaintiff, Rose White, withdrew from the action.

[2]Commonwealth of Massachusetts & others *vs.* Haverhill Golf & Country Club, Inc.

witness, over objection, to answer a question on redirect examination about whether she believed a particular practice of the club constituted discrimination, where defense counsel had invited the witness on cross-examination to give her view that another practice was not a manifestation of bias, where the trial judge gave the jury a forceful instruction that the over-all issue of whether there had been sex-based discrimination was for the jurors to decide, and where such evidence was a minor addition to the quantum of evidence. [316]

The judge in a gender discrimination action did not abuse his discretion in allowing, over objection, two plaintiffs to read into the record letters they had written to officers of the defendant golf and country club (club) of which they were members, describing the oppression of women golfers at the club and their having felt discriminated against, and in allowing redacted versions of the letters to be admitted as exhibits at the end of the trial, where the redacted letters could be received in evidence as expressing the plaintiffs' state of mind, and the evidence was exceedingly marginal. [316-317]

The judge in a gender discrimination action did not err in allowing, over objection, a plaintiff to testify as to the impact the lawsuit had on her physically, as no claims of compensation for physical harm were put before the jury [317]; likewise, the judge did not abuse his discretion in allowing, over objection, a plaintiff to testify about her emotional reaction to perceived gender discrimination, where nothing indicated that the plaintiff had by stipulation given up a claim for damages based on emotional distress [317-318].

In a gender discrimination action, the judge properly denied a motion for a directed verdict brought by the defendant golf and country club (club), where, apart from the direct evidence of discriminatory animus against women, there was ample evidence to take to the jury as to each of the nine plaintiffs the question whether the male officers of the club rigged rules regarding access to the golf links and applied rules in a manner that made women second class members subject to an uncomfortable and emotionally taxing environment at the club. [318]

The judge in a gender discrimination action correctly denied a motion for a mistrial based on plaintiffs' counsel's reference to the defendant's practices prior to 1990, despite the fact that the evidence in the case related to conduct from 1990 forward; counsel's stray remarks had no impact on the controversy because the trial was concerned with events in 1990 and beyond. [318-319]

In a gender discrimination action, the judge did not abuse his discretion in denying a motion for remittitur, where the emotional distress damages awarded were warranted by the evidence. [319-321]

The jury's award of punitive damages to the plaintiffs in an unlawful discrimination action was not shocking or such as would warrant this court's vacating the award of damages, where the jury appeared to have arrived at dollar amounts for punitive damages which reflected their assessment of the reprehensibility of the defendant's conduct and the deterrent effect of a punitive damages award. [321-323]

In a gender discrimination action, the judge did not abuse his discretion in issuing, without an evidentiary hearing, a detailed permanent injunction barring the defendant from continuing its discriminatory practices, where the

defendant did not explain what an evidentiary hearing would have added to the evidence amassed at trial, where no inquiry into irreparable harm was required, and where a detailed order was required to correct the defendant's longstanding violations of law. [323-324]

The judge in a gender discrimination action did not abuse his discretion in determining an award of attorney's fees in light of what he knew about the case without holding an evidentiary hearing or allowing the defendant's motion for discovery into fee issues, where the judge subtracted, from the fees sought, time expended on counts that were dismissed, and where the judge inquired into reasonable hourly rates and multiplied the hours reasonably expended by counsel times the rate. [324-325]

The findings of fact on which a judge in a civil action found a golf and country club in contempt of an injunction that the judge had previously issued were not clearly erroneous. [325]

The judge in a gender discrimination action should not have entered an order for the posting of an appeal bond by the defendant where the case involved a judgment for the payment of money. [325-327]

The judge in a gender discrimination action against a golf and country (club) properly dismissed as duplicative the plaintiffs' claims seeking damages under G. L. c. 93A for the club's unfair application of membership rules, where those claims arose out of the same facts underlying the discrimination damages, where the punitive damages award satisfied the multiple damages factor in G. L. c. 93A claims, and where the plaintiffs had already recovered their legal fees. [327]

CIVIL ACTIONS commenced in the Superior Court Department on November 22, 1996.

The cases were consolidated and tried before *John C. Cratsley,* J.

*Lawrence P. Murray (Nancy A. Newark* with him) for the defendant.

*Marsha V. Kazarosian (Janet E. Dutcher* with her) for Judith Borne & others.

*Alice J. Klein* for Linda Letendre.

*Catherine C. Ziehl,* Assistant Attorney General (*Kathleen Z. Quill,* Assistant Attorney General, with her) for the Commonwealth.

KASS, J. Nine women members of the Haverhill Golf and Country Club, Inc. (the "Club"), filed a complaint on August 10, 1995, with the Massachusetts Commission Against Discrimination, alleging that the Club, a place of public accommodation, discriminated unfairly against them on the basis of their sex.

See G. L. c. 272, § 98, and G. L. c. 151B, § 4.[3] See also 804 Code Mass. Regs. § 1.07(1).[4] The Attorney General filed a complaint against the Club on behalf of the Commonwealth and the two complaints were consolidated for trial. Proceedings on those complaints culminated in a judgment against the Club, based on jury findings, that aggregated $1,967,400 in damages. The Superior Court judge who presided at the trial also ordered permanent injunctive relief requiring cessation of the unlawful discriminatory acts that the jury had found the Club had been practicing. From the various judgments, including injunctions and judgments of contempt of court against it, the Club appeals.[5] We affirm.

1. *Facts.* Trial lasted for twenty-two days and there are twenty-six volumes of transcript, but the gender-related indignities that vexed women at the Club and goaded them to seek legal redress are susceptible to distillation. In summarizing the facts, we rely on what the jury could have found, given the state of the evidence read in a light favorable to the plaintiffs.

a. *Place of public accommodation.* Whether the Club is a place of public accommodation was in dispute at trial, but on appeal the Club does not challenge the determination by the jury that it is. The Club makes its facilities available for hire by the general public for social functions.[6] See generally G. L. c. 272, § 92A.

b. *Manipulation of membership categories.* There were two major membership categories at the Club: primary and limited. Primary members had the broadest range of access to the golf course and facilities. The access of limited members was, well, limited. In 1993, there were 325 primary members, of whom seven were women and 318 were men. Among the ninety limited members, eighty-four were women. As women lobbied to change their memberships to primary, the Club rules for

---

[3]Discrimination on account of sex in place of public accommodation.

[4]The Attorney General intervened in the action and added counts under G. L. c. 93A, § 2(*a*), unfair practices, and § 4, seeking injunctive relief against those practices.

[5]The record appendix furnished by the Club does not include the complaints.

[6]Under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12181(7)(L), a golf course is a place of public accommodation. See *PGA Tour, Inc.* v. *Martin*, 532 U.S. 661, 676 (2001).

making such a change, such as what payment needed to be made with an application, underwent frequent revision, and places on the waiting list for primary membership fluctuated without explanation. For example, one woman limited member seeking primary status began the process as number nine on the waiting list but after some additional months had fallen to number eighteen. Some women candidates unaccountably disappeared altogether from the waiting list for primary membership. Men leapfrogged over women to primary membership. Male junior members, when they turned age twenty-two, routinely received the opportunity to become primary members; women junior members did not.

c. *Limits on access of women to the golf course.* For limited members, starting time on the golf course — referred to in the record generally as "tee time" — was restricted. On Wednesdays, women limited members could not tee off from 10 A.M. to 2 P.M.; on Saturdays and Sundays women limited members could not play until after 11:30 A.M.; if the course was closed for a men's guest day, women could not play at all; male junior members could play during prime time, female junior members could not. Male limited members were allowed to play in prime time. Primary women members could not use the course during primary men's tournaments, but men could play during women's tournaments. Beginning in August, 1993, primary members could book tee times forty-eight hours in advance; limited members could book tee times only twenty-four hours in advance and, as a practical matter, were, therefore, often frozen out.

d. *Unequal application of rules.* In the summer of 1995, Karen Richardson organized a couples tournament. The tournament went forward with a field of sixty-eight couples. A full field was seventy-two couples, although tournaments for men had been played with fewer pairings. Robert Hanagan, the golf chairman of the Club, had, prior to the tournament, told Richardson to fill out the field with "Calloways" — golfers who did not have an established handicap.[7] For failure to comply with Hanagan's edict, Richardson was summoned to appear before the Club rules committee. When the committee met in judgment of Richardson, Scott Gleason, a member of the committee,

---

[7]At the time, there were no members of the Club who were Calloways.

referred to Hanagan as "God when it came to golf at the Haverhill Country Club and we don't defy God." Punishment meted out to Richardson, an avid golfer preparing for a tournament, was biblically stern: she was suspended from play for twenty-one days.

On the other hand, when two male members, one of whom was a member of the board of governors, cavorted in the buff with two waitresses in the Club swimming pool — an infraction of the rules — the response was indulgent. Volker Wrampe, the general manager was, upon inquiry, told by the Club president, "Not to worry about it. We do it all the time."

*e. The 19th Hole and the Card Room.* There was a grill room at the Club named The 19th Hole. Informally, it was called the men's grill. When he noticed the 19th Hole was being used by women members for a posttournament dinner, the Club president advised the Club's general manager that it would be preferable if women's dinner parties were booked for the main dining room. As for the Card Room, the Club president informed the general manager that it was a "sanctum sanitorium"[8] for the older gentlemen; he "must try to keep the women out of [it]."

*2. Continuing offense.* General Laws c. 151B, § 5, requires persons who claim that they have suffered unlawful discrimination to file a complaint, first, with the Massachusetts Commission Against Discrimination (MCAD).[9] That step must be taken within six months of the act or acts of discrimination that the complainant alleges. G. L. c. 151B, § 5. *Cuddyer* v. *Stop & Shop Supermarket Co.*, 434 Mass. 521, 531 (2001). As the plaintiffs filed with the MCAD on August 10, 1995, the acts of discrimination for which they could receive redress must ordinarily have occurred no earlier than February 10, 1995.

The trial judge, however, allowed (over objection) evidence of discriminatory acts by the Club against its women members going back to 1990, this on the ground that the gender discrimination described had the character of a continuing violation. In the *Cuddyer* case, the court explicated the "continuing violation doctrine" and differentiated its application

---

[8]We cannot tell from the record whether this was a malapropism or a pun.
[9]See 804 Code Mass. Regs. 1.10(2), second par. (2002).

in Massachusetts compared to the Federal courts. *Id.* at 530-540. Frequently, a person who suffers discriminatory conduct may hope that the situation will improve. For example, the women who felt themselves to be second-class citizens at the Club might reasonably have thought that once they had raised the consciousness of men at the Club to their grievances, the board of governors would take measures so that women at the Club were treated equally. With that in mind, and so as not to encourage premature discrimination complaints, persons may, starting with the first observed act of discrimination, reset the limitations clock with each new act of discrimination. *Id.* at 531.

Plaintiffs may bring an "action based on the cumulative effect of hostile acts." *Id.* at 533. So it is that "a plaintiff who demonstrates a pattern of sexual [discrimination] . . . that includes conduct within the six-month statute of limitations, may claim the benefit of the continuing violation doctrine and seek damages for conduct that occurred outside the limitations period, unless the plaintiff knew or reasonably should have known that her work situation was pervasively hostile and unlikely to improve." *Id.* at 539. See *National R.R. Passenger Corp.* v. *Morgan*, 536 U.S. 101, 116-117 (2002); *Beaupre* v. *Cliff Smith & Assocs.*, 50 Mass. App. Ct. 480, 490 (2000); *Morrison* v. *Northern Essex Community College*, 56 Mass. App. Ct. 784, 792-798 (2002).[10] Whether there is a history of continuing violation, the Club urges here, as it did at trial, is a question of fact that the trial judge also should have put to the jury. Instead, the judge decided that question himself. When there is undisputed evidence of acts that the jury may find manifested gender discrimination, and those acts have characteristics in common with acts committed within the limitations period, it becomes a question of law for the judge whether the earlier acts may be considered by the jury on the basis of the continuing violation doctrine. See and compare, e.g., *Beaupre* v. *Cliff Smith*

---

[10]The Federal courts distinguish continuing violations which are "systemic" (pervasive policy) from those that are "serial" (they keep doing the same sort of things). *Jensen* v. *Frank*, 912 F.2d 517, 522-523 (1st Cir. 1990). *Provencher* v. *CVS Pharmacy, Div. of Melville Corp.*, 145 F.3d 5, 14 (1st Cir. 1998). See *Morrison* v. *Northern Essex Community College*, 56 Mass. App. Ct. at 793 n.14.

*Assocs.*, 50 Mass. App. Ct. at 490. See, in a different factual context but illustrating the principle, *Saenger Org., Inc.* v. *Nationwide Ins. Licensing Assocs., Inc.*, 119 F.3d 55, 65 (1st Cir. 1997).

3. *Jury instructions.* The trial judge delivered his charge to the jury on October 22, 1999, faithful to the line of cases that began with *Wheelock College* v. *Massachusetts Commn. Against Discrimination*, 371 Mass. 130, 138-139 (1976), and ended with *Blare* v. *Husky Injection Molding Sys. Boston, Inc.*, 419 Mass. 437, 440-446 (1995). His instructions, therefore, included the procrustean special verdict questions that later decisions recommended against and asked of the jury a rigidity of analysis that later decisions modified. See *Abramian* v. *President & Fellows of Harvard College*, 432 Mass. 107, 117-119 (2000); *Lipchitz* v. *Raytheon Co.*, 434 Mass. 493, 508 (2001); *Weber* v. *Community Teamwork, Inc.*, 434 Mass. 761, 775 (2001); *Scott* v. *Boston Hous. Authy.*, 56 Mass. App. Ct. 287, 290 (2002). Concerning the effect of a finding of pretext, the judge presented to the jury a written special question that began by following the "pretext only" formula of *Blare* v. *Husky Injection Molding Sys. Boston, Inc.*, *supra* at 444, but added the saving grace of defining the word "pretext" with the words "not the real reason(s) for gender discrimination."[11] This made the question consistent with the *Lipchitz* opinion, *supra* at 501, which modified the *Blare* formulation: the fact finder, if persuaded that the defendant's legitimating reasons were false, "may (but need not) infer that the employer is covering up a discriminatory intent, motive or state of mind." *Ibid.* The ultimate question for the finder of fact is whether the conduct complained of was driven by unlawful considerations of sex, age, race, color, religion, or sexual orientation. See *id.* at 504-506; *Scott* v. *Boston Hous. Authy.*, 56 Mass. App. Ct. at 290.

Counsel for the Club anticipated the case law to come. At the charge conference, he suggested that, in addition to putting to

[11]Question 1.3 is prototypical; i.e., an identical question was asked as to the nine individual plaintiffs. The question read: "Did the plaintiff, Judith Borne, prove that the reason(s) given by the defendant, Haverhill Golf and Country Club, Inc., were a pretext (i.e., not the real reason[s]) for gender discrimination?"

the jury in writing the question whether the legitimizing reason offered by the Club for its conduct was a pretext, the judge should also put as a final question whether discrimination was a motivating factor in the actions of the Club. The judge declined to so revise the written questions.

In the course of his oral instructions to the jury, the judge reviewed the written questions. He described what was meant by a prima facie showing that established a presumption of discriminatory conduct. The jurors were then to consider whether the Club had offered legitimizing reasons. Those reasons might be unsound or even absurd, and the actions of the Club might appear arbitrary or unwise. Nonetheless, the proffer of reasons, the judge explained to the jury, required the plaintiffs to persuade them that the defendant's reasons were not genuine but a pretext for discrimination. The judge continued as follows:

> "And so, jurors, if you have answered 1.1 yes, and then have answered 1.2 yes, you must then consider has the plaintiff . . . proven by a preponderance of the evidence that the Haverhill Golf and Country Club's reasons were a pretext; that is, not the real reasons for a practice or pattern or individual acts of gender discrimination.

> "Jurors, the plaintiff bears the burden of persuasion, the burden of proof, on the ultimate issue of discrimination in Question 1.3. And therefore they must produce on Question 1.3 evidence sufficient to support a jury verdict that it was more likely than not that the articulated reason or reasons of the defendant were actually a pretext for actual discrimination. If the defendant's reasons are not discriminatory and if the plaintiff does not prove they were pretexts, the plaintiff cannot prevail.

> ". . .

> "It is also true, jurors, in the law of gender discrimination, in fact in the law of any type of claim of discrimination, that the plaintiffs, that's the individual plaintiffs and the Commonwealth, do not have to prove that gender discrimination was the only or the sole motive or intent of the defendant. They need only prove by a preponderance of

the evidence that it was one of their motives or intents for what they did."

We are of opinion that overall, the judge's instructions fall on the pass side of the verge. They do not, as the *Lipchitz* opinion, 434 Mass. at 501, pronounced unacceptable, tell the jury that if they find the defendant's legitimizing reason is a pretext, that alone requires a finding in favor of the plaintiffs. Rather, the judge informed the jury — as he had in an earlier passage in the charge — that the ultimate issue is discrimination, and that the jurors are to consider whether the legitimizing reason offered by the defendant is a pretext for "actual discrimination." If the plaintiffs are to prevail, they must prove that the defendant's conduct was animated by a discriminatory purpose. That instruction is sufficient under *Lipchitz, supra,* and *Ventresco* v. *Liberty Mut. Ins. Co.,* 55 Mass. App. Ct. 201, 205-209 (2002), even if not in the form a proper instruction would take after publication of those opinions.

There are two other aspects of the case that make insignificant the nuances of the instruction about the consequences of false legitimizing reasons. First, as to six of the plaintiffs, the jury found that no legitimizing reason had been put forth. Second, there was direct evidence of gender discrimination: the admonition to the general manager not to book the 19th Hole for women's groups, dining and to keep women out of the Card Room altogether. A member of the board of governors put it plainly: "Well, get those broads out of here." The president of the Club said women should be "on the miniature golf course."[12] See *Gates* v. *Flood,* 57 Mass. App. Ct. 739, 744 (2003).

Concerning the jury instructions, the Club further objects, for the first time on appeal, that the judge erred when he said that gender discrimination need not be the sole motive for the actions of the Club about which the plaintiffs complained. The plaintiffs, the judge said, "need only prove by a preponderance of the evidence that it was one of [the] motives or intents for

[12]The shifting burden analytical framework was originally designed to guide judges in deciding summary judgment motions in discrimination cases, see *Ventresco* v. *Liberty Mut. Ins. Co.,* 55 Mass. App. Ct. at 209, when the evidence of discrimination is "indirect" in the sense that the putative offending party has not given voice to an animus based on gender, race, age, etc.

what [the Club] did." In accordance with *Lipchitz* v. *Raytheon Co.*, 434 Mass. at 504-506, the jury is to be instructed that discrimination is the determinative factor.

That is a difference in emphasis, but the point was not raised at trial and cannot be raised for the first time on appeal. Mass. R.Civ.P. 51(b), 365 Mass. 816 (1974).

4. *Evidentiary rulings.* a. *Ultimate issue.* On cross-examination, counsel for the Club had asked Mona Main, who had been a member of the board of governors of the Club from 1993 to 1996, whether she regarded the conduct of female golf tournaments as an exercise in gender bias. There was no objection to that question. On the theory that the defense had opened the subject of whether Main regarded particular acts as indicative of bias, counsel for the individual plaintiffs asked Main, on redirect, whether she believed "the practice at [the Club] of having male primary tournaments and excluding female primaries for tee times or to participate constituted discrimination?" Over objection, Main was allowed to answer and she said, "Yes, I do." The Club argues error on the ground that the answer went to the ultimate question that the jury were to decide. See *Puopolo* v. *Honda Motor Co.*, 41 Mass. App. Ct. 96, 98 (1996); Liacos, Brodin & Avery, Massachusetts Evidence § 7.3 (7th ed. 1999).

No reversible error occurred for several reasons. First, having invited the witness on cross-examination to give her view that a certain practice was *not* a manifestation of bias, the defense was, indeed, in an awkward position from which to object to a question whether certain other conduct *was* such a manifestation. Second, before the latter question was asked and answered, the trial judge gave the jury a forceful instruction that the over-all issue of whether there had been discrimination on the basis of sex at the Club was for the jurors to decide. Third, Main's answer was hardly a bombshell. Rather, it was a minor addition to the quantum of evidence that there was a war between men and women at the Club about access. That was obvious from the complaint. See *Dalrymple* v. *Winthrop*, 50 Mass. App. Ct. 611, 616 (2000).

b. *State of mind.* Over objection, two plaintiffs, Judith Borne and Lorna Kimball, read into the record letters they had written

to officers of the Club about discrimination against women golfers at the Club. The judge took the objection as going to the authenticity of the letters. As it later developed, the objection was to the content. To say the least, the letters had a tendentious quality, but they were campaign literature; that is why the authors wrote them.

Before allowing the letters to be admitted as exhibits at the end of the trial, the judge redacted them substantially. What was left constituted an expression of the obvious state of mind of Borne and Kimball about gender oppression at the Club. For that purpose, the content of the letters and the letters themselves could be received in evidence (although it would not have been an abuse of discretion to exclude them). See *Carter* v. *Commissioner of Correction*, 43 Mass. App. Ct. 212, 225 (1997); Liacos, Brodin & Avery, Massachusetts Evidence § 8.2.6. Once again, the evidence in question was exceedingly marginal; informing the jury that the plaintiffs *felt* discriminated against was both cumulative and obvious. There was no reversible error.

c. *Testimony about physical and emotional distress.* Lorna Kimball was asked by her lawyer: "Did this suit have any impact at all on you?" Over objection, Kimball answered: "Well, yes. I had a severe case of shingles in 1995."[13] No expert evidence was offered tying shingles to the emotional distress incident to feeling discriminated against. The defense, however, made no motion to strike. Rather, the Club's counsel cross-examined Kimball about her lack of knowledge of causal links between her experience at the Club and coming down with shingles. Again, there was no reversible error. No claims of compensation for physical harm were put before the jury. Kimball's testimony about shingles has the innocence of total irrelevance.

The Club's last evidentiary claim of error is that Linda Letendre, a plaintiff, was allowed to answer, over objection, the following question: "How did it make you feel to wait on an empty tee while male juniors could tee off in front of you?" Answer: "It made me angry. I felt like it just wasn't fair." The ground of objection was that the plaintiff Letendre had by

---

[13]Shingles, or herpes zoster, is a painful inflammation of nerve endings.

stipulation given up a claim for damages based on emotional distress. There was intense argument but the Club was unable to turn up a stipulation and the docket contained no record of one. In the circumstances, the trial judge acted within his discretion in ruling that Letendre might testify about her emotional reaction to perceived gender discrimination.

5. *Denial of motion for a directed verdict.* We take as largely pro forma the Club's argument that the judge erred in denying its motion for a directed verdict. Taken in a light favorable to the defendant, the evidence was susceptible of an interpretation that the Club's rules were in flux, that financial considerations lay behind the fees for limited members to become primary members, and that tee times were established to accommodate when the various categories of members were most likely to be available to play golf. In appraising a motion for a directed verdict, however, we do not assess the evidence in a light favorable to a defendant; we assess it in the light favorable to the plaintiff, drawing all inferences in favor of the plaintiff that rationally and reasonably may be drawn. *Poirier* v. *Plymouth*, 374 Mass. 206, 212 (1978). *Dartt* v. *Browning-Ferris Indus., Inc. (Mass.)*, 427 Mass. 1, 16 (1998). *Fahey* v. *Rockwell Graphic Sys., Inc.*, 20 Mass. App. Ct. 642, 644 (1985).

Apart from the direct evidence of discriminatory animus against women, there was ample evidence to take to the jury the question whether, concerning access to the golf links, the male officers of the Club rigged rules and applied rules in a manner that made women second class members, resulting in an uncomfortable and emotionally taxing environment at the Club for those women members who brought this action. The details appear in our recitation of pertinent facts. As there are nine individual plaintiffs, the record must contain evidence of gender-based discrimination as to each of them. We have analyzed the record, and there is. It would unduly extend the length of this opinion were we to recapitulate in detail how each plaintiff was affected.

6. *Defendant's objection to plaintiffs' closing argument.* During her closing argument, counsel for the plaintiffs stated that before 1990, a woman could not be a primary member of the Club. The evidence in the case related to conduct from 1990

forward. The defendant objected, and the trial judge admonished plaintiff's counsel to make her arguments from evidence admitted at trial. She sailed on, asserting that "the evidence is clear that prior to 1990 women could not be primary members." That statement is not entirely without support. One could infer from the process of adopting rules in 1990 for allowing women to become primary members that it was otherwise pre-1990, but as the trial concentrated on 1990 and beyond, the remark was one that counsel should not have made. For the very reason that the trial was concerned with events in 1990 and beyond, counsel's stray remarks had no impact on the controversy. The judge acted not only within his considerable discretion but quite correctly in denying a motion for a mistrial based on the reference to a pre-1990 state of things. See *Rolanti* v. *Boston Edison Corp.*, 33 Mass. App. Ct. 516, 529 (1992). Compare *Harlow* v. *Chin*, 405 Mass. 697, 703-706 (1989).

7. *Denial of motion for remittitur.* The damages that the jury awarded were considerable. There were three components: compensatory damages in the aggregate of $424,000, punitive damages of $1,430,000, and $113,400 for breach of an implied covenant of good faith and fair dealing. That last component ($12,600 per plaintiff) is not objected to on appeal.[14] The injury which underlay the compensatory damages was emotional distress, a form of injury held in several cases to be recoverable for violation of antidiscrimination laws. *Massachusetts Commn. Against Discrimination* v. *Franzaroli*, 357 Mass. 112, 115-116 (1970). *Buckley Nursing Home, Inc.* v. *Massachusetts Commn.*

---

[14]Damage awards by plaintiff:

|  | Compensatory | Punitive |
| --- | --- | --- |
| Borne | $64,000 | $230,000 |
| Brochetti | $64,000 | $230,000 |
| Cordner | $24,000 | $ 50,000 |
| Dean | $16,000 | $ 50,000 |
| Johnston | $48,000 | $190,000 |
| Kimball | $48,000 | $170,000 |
| Letendre | $56,000 | $210,000 |
| Richardson | $80,000 | $250,000 |
| Torrisi | $24,000 | $ 50,000 |

*Against Discrimination*, 20 Mass. App. Ct. 172, 182 (1985). See *Bournewood Hosp., Inc.* v. *Massachusetts Commn. Against Discrimination*, 371 Mass. 303, 315-317 (1976).

The Club moved for a remittitur, a motion that the trial judge denied. Anger, disappointment, outrage, and disgust, the Club argues, describe emotional distress of a fairly low level and do not justify $424,000 in damages. It is not an easy matter to develop quantitative criteria for emotional distress damages. *Labonte* v. *Hutchins & Wheeler*, 424 Mass. 813, 825 (1997). Indeed, the court observed in *Bournewood Hosp., Inc.* v. *Massachusetts Commn. Against Discrimination*, 371 Mass. at 317 n.11, that the standards for damages for emotional distress in consequence of unlawful discrimination are, for "reasons of statutory construction and policy," not stringent. The plaintiffs did not display any gift for expressive language to describe their emotional distress, but much turns on what the finder of fact may infer. "[E]motional distress damages can be sustained even in the absence of physical injury or psychiatric consultation." *Buckley Nursing Home, Inc.* v. *Massachusetts Commn. Against Discrimination*, *supra* at 182. The jurors calibrated the compensatory damages with some finesse. See note 14, *supra*.

A jury, composed, as they are, of persons from varying walks of life and reflecting a variety of experience, make a particularly suitable institution for assessing the emotional damage incident to being placed in a second-class citizen status, made to feel inferior, socially ostracized, and demeaned in public. This was a form of discrimination freighted with economic side effects, and, therefore, the more susceptible to compensation in dollars.

Playing golf was not one of the unalienable rights of 1776,[15] but it is naive not to recognize the degree to which golf links and the country club are the locale for developing professional and business contacts. Golf and the country club lubricate the advance of careers. Deals are cut on the fairway and in the clubhouse. Kamp, Gender Discrimination at Private Golf Clubs,

---

[15]Although one of those rights was the pursuit of happiness, a significant, if elusive, goal of the game of golf.

5 Sports Law. J. 1, 2-3 (1998).[16] See Jolly-Ryan, Chipping Away at Discrimination at the Country Club, 25 Pepp. L. Rev. 495, 497-498 (1997), making the connection between country clubs and business opportunity, on the one hand, and psychological harm from acts of discrimination on the other.

In acting on a motion for a remittitur, a judge has broad discretion. *Powers* v. *H.B. Smith Co.*, 42 Mass. App. Ct. 657, 665 (1997). As in *Dalrymple* v. *Winthrop*, 50 Mass. App. Ct. at 619-621, the judge expressed his view in writing that he considered the compensation awards warranted by the evidence. We do not think there was an abuse of discretion.

8. *Punitive damages.* By statute and case law, a plaintiff in an unlawful discrimination case may recover punitive damages. G. L. c. 151B, § 9. *Bain* v. *Springfield*, 424 Mass. 758, 767 (1997). *Labonte* v. *Hutchins & Wheeler*, 424 Mass. at 827. As in the case of compensation for emotional distress, the imposition of punitive damages is not an exercise in quantitative analysis. The trial judge instructed the jury that they were to award punitive damages only if they found that there had been "extraordinary misconduct toward the plaintiff[s] by the defendant." He further instructed the jury that the purpose of punitive damages was to punish the defendant and "to deter future acts of illegal discrimination against females." He amplified his remarks by telling the jury, "Punitive damages may only be given for malicious, wanton or oppressive conduct done in reckless disregard of the plaintiff's rights or in callous indifference to the plaintiff." Those instructions are consistent with criteria developed in cases such as *BMW of N. Am., Inc.* v. *Gore*, 517 U.S. 559, 575-585 (1996), and *Dartt* v. *Browning-Ferris Indus., Inc. (Mass.)*, 427 Mass. at 17-17a, which mention sizing up the reprehensibility of the conduct and the deterrent effect of a punitive damages award. The *Dartt* opinion, in turn, looked to the Restatement (Second) of Torts § 908(2) (1979).

After the instant case was tried, in *State Farm Mut. Auto. Ins.*

---

[16]Forty-four percent of women golfers are in professional, managerial, or administrative positions, and nineteen percent list business as a reason to tee off. Marchetti, Kicking Off Their Heels; The Changing Corporate World is Pushing Women to Make a Play for the Golf Course, Sales & Marketing Management, Nov. 1995, at 126, cited in Kamp, *supra* at 3.

*Co.* v. *Campbell*, 538 U.S. 408 (2003), the Court restated the basic principle that punitive damages "are aimed at deterrence and retribution," *id.* at 416, and that in reviewing a punitive damage award, the three guideposts of review are: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Id.* at 418. Although the conduct of the defendant insurer in *State Farm* involved an appalling mix of misleading its customer in the particular case, as well as a nationwide program of mendacity and manipulation, including falsification of company records, the Court thought a punitive award of $145,000,000 against a compensatory award of $1,000,000 (the jury had awarded $2,600,000 in compensatory damages but the trial judge had reduced those damages to $1,000,000), was over the top. *Id.* at 428.

In the instant case, there was evidence that warranted a finding that the Club had been cavalier and callously indifferent about failing to treat women golfers as equals. The conduct persisted in the face of warning shots in the form of letters to the board of governors about what it was that the plaintiffs were aggrieved. Supplication had been ineffectual and, in the circumstances, a finder of fact could reasonably conclude that punitive damages might have a deterrent effect. In terms of the ratios of the punitive damages to compensatory damages — they ranged from a high of 3.96 (Johnston) to a low of 1.37 (Corder and Torrisi) — numbers that are within ratios held acceptable in reported cases, e.g., *Pacific Mut. Life Ins. Co.* v. *Haslip*, 499 U.S. 1, 23-24 (1991) (ratio of four); *TXO Prod. Corp.* v. *Alliance Resources Corp.*, 509 U.S. 443, 459-462 (1993) (ratio of 526, suggesting there is no definitive upper limit).

The limitation emphasized in the *BMW* case, *supra* at 580-583, is that the punitive damage award not shock the reviewing court. In *State Farm Mut. Auto. Ins. Co.* v. *Campbell, supra* at 425, the Court eschewed "rigid benchmarks" but mused that "[s]ingle-digit multipliers are more likely to comport with due

process." We are impressed but not shocked by the punitive damages award in this case. Again, the jury, proceeding on the collective sum of their experiences, appear to have worked their way to dollar amounts that reflect the jurors' assessment of the reprehensibility of the Club's conduct and what it will take to deter like conduct in the future by the Club and other clubs that are places of public accommodation.

9. *Scope of injunctive relief.* In its complaint, the Commonwealth asked for a permanent injunction "barring the defendant from continuing its discriminatory practices on the basis of sex with respect to membership in the Club." The trial judge issued a detailed injunction that contained prohibitions, as well as affirmative duties that included disclosure of information, compilation and distribution of a handbook that describes the Club's governance and golfing privileges, and training sessions for the Club's officers and employees about gender bias and fiduciary obligations of officers and directors of nonprofit organizations. We have attached to this opinion as an appendix the entire permanent injunction.

The Club grumbles that no evidentiary hearing preceded issuance of the injunction. The Club does not explain what an evidentiary hearing would have added to the evidence amassed in four weeks of trial. In protesting that there has been no inquiry into who would suffer irreparable harm, the Club mistakenly seeks to graft onto a permanent injunction criteria that apply to preliminary injunctive relief. See *Packaging Indus. Group, Inc.* v. *Cheney,* 380 Mass. 609 (1980). Nor is the Attorney General, when requesting an injunction in the public interest, required to make a showing of irreparable harm. *Commonwealth* v. *Mass. CRINC,* 392 Mass. 79, 89-90 (1984). *Commonwealth* v. *Wellesley Toyota Co.,* 18 Mass. App. Ct. 733, 737 (1984).

The Club protests that the injunction, by reason of its detail, micromanages the Club. Had the injunction been less specific, however, the Club would infallibly have protested that it swept too broadly and that the Club had not been fairly placed on notice as to what action or inaction on its part would cause it to be in contempt. The scope of equitable relief is left to the discretion of the trial judge. *Commonwealth* v. *Adams,* 416 Mass. 558, 566 (1993). A court may "mould each decree to the neces-

sities of the particular case[;] . . . equity [is] the instrument for nice adjustment and reconciliation between the pubic interest and private needs." *Hecht Co.* v. *Bowles*, 321 U.S. 321, 329 (1944). Courts often employ detailed orders to correct violations of public rights. *Perez* v. *Boston Hous. Authy.*, 379 Mass. 703, 734 (1980). "The rule of thumb may be that the more indurated the violations of law and the remedial injunction, the more imperative and controlling the later superseding injunction." *Ibid.* Here there was no violation of a prior injunction but certainly a history of hardened position of resistance to the objectives of the permanent injunction. Detail was called for.

10. *Attorney's fees.* Under G. L. c. 151B, § 9, the plaintiffs, if they prevailed, were entitled to recover their reasonable counsel fees and costs, and they brought a motion to do so, supported by affidavits and a memorandum.[17] The Club filed counter affidavits and a memorandum of law. The judge ordered that the Club pay $468,072 in counsel fees and $18,073.62 in costs, a total award of $486,145.62.

In making his award, the judge subtracted, from the fees sought, time expended on counts that were dismissed. After establishing the time reasonably expended, the judge inquired into reasonable hourly rates and multiplied the hours times the rate. This is the "lodestar" approach, see *Fontaine* v. *Ebtec Corp.*, 415 Mass. 309, 324-326 (1993), which assesses factors such as complexity, the result obtained, and the experience, reputation, and ability of the lawyer. *Id.* at 325.

The Club had moved for discovery into hourly rates, billing practices, and expertise of counsel for the plaintiffs. It also requested an evidentiary hearing. The trial judge granted neither. He explained in his memorandum of decision that as trial judge he had ample opportunity to size up the skill and preparation of counsel and the value of what counsel for the plaintiffs had achieved. He saw no point in launching an ancillary litigation. There was no error.

---

[17]The Commonwealth could not petition for counsel fees but, in its brief, wrote in support of the position on fees of the private plaintiffs. The Attorney General wrote that an "appropriate award of attorney's fees promotes Chapter 151B's policy of enlisting the help of private attorneys general in the fight against discrimination."

Generally, a judge — and particularly the trial judge — can, from the judge's own experience, determine an award of legal fees; there is no requirement for an evidentiary hearing. *Heller* v. *Silverbranch Constr. Corp.*, 376 Mass. 621, 630-631 (1978). *Robbins* v. *Robbins*, 16 Mass. App. Ct. 576, 582 (1983). See *Industrial Gen. Corp.* v. *Sequoia Pac. Sys., Inc.*, 849 F. Supp. 820, 827 n.12 (D. Mass. 1994). There have been cases in which an award of fees required reference to factors that would not have been illuminated by observing the trial. See, e.g., G. L. c. 149, § 29, applied in *Manganaro Drywall, Inc.* v. *White Constr. Co.*, 372 Mass. 661, 666 (1997). In light of what he knew about the case, the trial judge could, within the exercise of his discretion, decide that depositions about fee issues would accomplish little beyond generating other fee issues.

11. *Contempt of injunction.* Upon an oral motion by the private plaintiffs, the trial judge on March 1, 2001, found the Club had contumaciously failed to comply with the injunction by imposing unequal restrictions on male and female primary members in tournament play. The judge did so after holding a hearing and making detailed findings of fact, on the basis of which he could conclude that there had been unequivocal disobedience to an unequivocal order. See *Demoulas* v. *Demoulas Super Mkts., Inc.*, 424 Mass. 501, 565 (1997). On their face, the findings of the judge are not clearly erroneous, and the Club has furnished no transcript of the contempt hearing that might provide a basis for examining them further. For the contempt found, the judge imposed no penalty. We do not elaborate further on the question.[18]

12. *The appeal bond issue.* In a companion case, the Club challenged the authority of the trial judge to order the Club to post an appeal bond in the amount of $3,000,000 to secure payment of the judgment that the plaintiffs had obtained in the trial court.[19] Certain statutes provide for the posting of a bond to take a next step in a litigation process. See, e.g., G. L. c. 231,

---

[18]By an order dated March 13, 2002, the judge found three additional acts of contempt of the injunction and imposed a civil fine of $10,000.

[19]The Club on appeal represented that the cost of the bond was $25,000. The Club brought a petition under G. L. c. 231, § 118, first par., for relief from the order to post an appeal bond. The single justice stayed the order to

§ 60B (medical malpractice action after rejection by tribunal); G. L. c. 231, § 98 (appeals from District Court judgment); G. L. c. 231, § 104 (removal from District Court to Superior Court); G. L. c. 239, § 5 (summary process); appeals from the board of appeal of Boston under St. 1956, c. 665, § 11 (as to which see *Damaskos* v. *Board of Appeal of Boston*, 359 Mass. 55 [1971]).

Under our law, the taking of an appeal stays execution of a judgment for the payment of money. Mass.R.Civ.P. 62(d), 365 Mass. 830 (1974). The Massachusetts rule differs from its Federal analog, which provides for the posting of a supersedeas bond to obtain a stay of judgment pending appeal. The difference in the rules has been made the basis for holding that there is no authority, in cases involving an appeal from a money judgment, that permits a Massachusetts trial judge to order the posting of bond as a condition of pursuing the appeal. *MacLachlan* v. *Brotherhood Oil Corp.*, 10 Mass. App. Ct. 811, 812 (1980). See *Schlager* v. *Board of Appeal of Boston*, 9 Mass. App. Ct. 72, 77 n.12 (1980). As the court noted in *Damaskos* v. *Board of Appeal of Boston*, 359 Mass. at 64, appeal bonds raise questions about obstructing proper appeals, that is, those that raise substantial appellate issues.

Parties may request from a trial court judge an attachment of real property or the grant of security interest in personal property to protect a judgment pending appeal. For purposes of releasing or avoiding such an attachment or security interest, a judge may order the posting of a security bond by way of substitution. Also, a trial or appellate judge may stay the operation of injunctive relief during the pendency of an appeal and may order the posting of a bond to secure the rights of the party that prevailed at trial. See Mass.R.Civ.P. 62(c), 365 Mass. 830 (1974), and Mass.R.Civ.P. 62(e), 382 Mass. 821 (1980). We repeat, by way of emphasis, that what we take not to be authorized by our rules of procedure is a general power to order the posting of appeal bonds in cases involving judgments for the payment of money. That was the purpose of the appeal bond ordered in this case.

post the bond and reported the question to the full panel that would hear the appeal from the underlying judgment.

Accordingly, the order for the posting of a bond should not have been entered.

13. *Plaintiffs' claim under G. L. c. 93A.* The plaintiffs sought damages under G. L. c. 93A, § 2, on the ground that the Club exercised bad faith, hence acted unfairly, in the application of membership rules. These claims arise out of the same bundle of facts as those which underlay the discrimination damages. The multiple damages factor in c. 93A claims has been satisfied by the punitive damages that were awarded in connection with the discrimination claims. The plaintiffs have also already recovered their legal fees. The judge was right to dismiss the c. 93A claims as duplicative. See *Calimlim* v. *Foreign Car Center, Inc.*, 392 Mass. 228, 235 (1984).

The judgment in No. 01-P-1705 is affirmed. Concerning the bond that is the subject of the appeal in No. 00-P-1732, the order requiring the posting of that bond is vacated. The parties shall bear their own legal fees relating to this appeal.

*So ordered.*

APPENDIX.

Commonwealth of Massachusetts

Suffolk, ss.                                                    Superior Court
                                                               Civil Action
                                                               No. 96-6511-C

JUDITH BORNE, and COMMONWEALTH OF MASSACHUSETTS,
et al., Plaintiffs

*vs.*

HAVERHILL GOLF & COUNTRY CLUB, Defendant

PERMANENT INJUNCTION

After a trial on the merits, and upon consideration of the compelling evidence produced by the individual plaintiffs, the Attorney General, and all of their witnesses of gender discrimination in membership categories, tournament participation, allocation of tee times, and use of club facilities, this Court finds the following permanent injunctive relief is warranted in the public interest, now therefore, IT IS HEREBY ORDERED AND ADJUDICATED:

I. PERMANENT PROHIBITORY INJUNCTIVE RELIEF

The defendant Haverhill Golf and Country Club, Inc. ("Club"), its Board of Governors, Committee Chairs, Committee members, employees, agents, servants, successors and assigns directly or indirectly, individually or in concert with others, or through any corporation or any other business entity, or any other device, are permanently enjoined from the following:

1.  Making any distinction, restriction or discrimination on the basis of sex in relation to the treatment of any applicant for membership, or transfer or change in membership status, at the Club, including but not limited to the manipulation, reordering or reconfiguration of any waiting list to the detriment of female applicants; applying "special consideration" to the benefit of only male applicants and failing to offer female Junior members "Primary membership" status on the same basis as male Junior members. Except as otherwise stated below, the Club must take members from the waiting list to be admitted to membership for each membership category in chronological order by the date of membership application and/or request for transfer.

2.  Making any distinction, restriction or discrimination on the basis of sex in relation to any rights, benefits, services and/or privileges at the Club.

3.  Making any distinction, restriction or discrimination on the basis of sex or taking any step or action that would serve to discourage female members' access to any and all facilities (other than restroom and shower facilities) located at the Club, including but not limited to the "19th Hole" or "Grille Room," and the "Card Room," also known as the Men's Lounge at the Club. Such distinctions or restrictions hereby enjoined shall include the posting of "private" signs, referencing said facilities in Club sponsored or published documents in a restrictive or discriminatory manner, permitting members or guests at the Club to so restrict or distinguish such access by word or deed, interfering, aiding, or

assisting others to interfere with any person's exercise or enjoyment of any right granted by G.L. c. 151B, §§ 4(4A) and 5.

4.  Discriminating on the basis of sex relative to the admission or treatment of any person at the Club.

5.  Maintaining any policies or practices which discriminate against women or deny or discourage them from equal access to the Club's facilities and services.

6.  Failing or refusing to disclose to any applicant for membership, including any member or applicant for membership transfer, all membership options, including but not limited to the fact and amounts of all initiation fees, application fees, dues, dining or other fees and any and all applicable benefits, privileges and/or restrictions associated with each membership category, including access to tee times and ability to play in Club-sponsored tournaments.

7.  Coercing, intimidating, threatening, or interfering with any woman, or another person associating with a woman, in the exercise or enjoyment of any right granted or protected by G.L. c. 272, § 98; or G.L. c. 151B.

8.  Coercing, intimidating, threatening, or interfering with any person who has aided or encouraged any other person in the exercise or enjoyment of any right granted or protected by G.L. c. 272, § 98; or G.L. c. 151B.

9.  Retaliating, threatening, or taking reprisal against any person for commencing, proceeding with, or obtaining relief in any judicial or administrative action, including the filing of any internal complaint against the Club, or any complaint with the Massachusetts Commission Against Discrimination and/or the Attorney General's Office, or any other local, state or federal governmental entity, or for serving as a witness or affiant in such proceedings, relative to allegations of discriminatory conduct by the Club.

10. Slandering or defaming any person for commencing, proceeding with, or obtaining relief in any judicial or administrative action, including the filing of any internal complaint against the Club, or any complaint with the Massachusetts Commission Against Discrimination and/or the Attorney General's Office, or any other local, state or federal governmental entity, or for serving as a witness or affiant in such proceedings, relating to allegations of discriminatory conduct by the Club.

## II. PERMANENT AFFIRMATIVE INJUNCTIVE RELIEF

In order to (1) redress the previous discriminatory conduct towards women proven during this trial, and (2) prevent the recurrence of the discriminatory practices in membership, tournament participation, tee times, and use of club facilities that the jury determined occurred to the plaintiffs and other women in this case, and because the public interest requires full compliance with our Commonwealth's public accommodations and antidiscrimination laws as set forth in G.L. c. 272, sec. 98 and G.L. c. 151B, this Court further permanently ORDERS from the date of entry of this ORDER that the defendant Club, its Board of Directors, Committee Chairs, Committee members, employees, agents, servants, successors and assigns, directly or indirectly, individually or

in concert with others, or through any corporation, business entity, or any other device shall take the following affirmative actions:[1]

### A. DISCLOSURE OF INFORMATION TO APPLICANTS AND MEMBERS

1. Within sixty (60) days of entry of this Order, the Club shall fully and completely disclose in writing to all applicants and to all current Club members, including Pool and Social members and applicants therefore, all of the Club's membership categories and options, including any and all rights, privileges, benefits, restrictions, fees, and transfer options associated with each membership category (i.e., Primary, Limited, Family, etc.) and do so prior to the Club accepting any applications, fees, dues, or other financial payments from applicants for membership or members seeking to convert or transfer membership categories.

2. Within sixty (60) days of entry of this Order, the Club shall fully and completely disclose all tee time rights, tournament participation rights, privileges, benefits and restrictions associated with each membership category (i.e., Primary, Limited, Family, etc.) in writing by first class mail to all prospective members or members who are seeking to transfer between membership categories, and do so prior to the Club's acceptance of any applications, fees, dues, or other financial payment from applicants for membership or transfer.

### B. ADDITIONAL DISCLOSURE OF INFORMATION TO MEMBERS

1. Within thirty (30) days of any change to the tee time rights, tournament participation rights, and any other rights, privileges, benefits or restrictions related to any membership category, the Club shall provide written notification to each member of the changes. A record of such changes shall be permanently maintained at a central repository at the Club.

2. The membership category names "Primary," "Limited" and "Family" shall not be changed, and any attempt to circumvent the provisions of this Order by so changing membership category names, without prior written court approval, may be punishable as Contempt of Court.

3. Within sixty (60) days of entry of this Order, the Club shall provide written notification to all members, regardless of whether they hold a bond, of any and all rights, privileges, and benefits associated with bond ownership at the Club.

### C. CLUB POLICIES

1. Within sixty (60) days of the entry of this Order, the Club shall create and maintain one membership handbook that describes the Club's governance structure and golfing privileges. With respect to information

---

[1] While each of these required actions is in the public interest and is necessary to halt current and prevent future discriminatory practices towards women, as shown at trial, each is also carefully tailored to respond to the illegal conduct towards females proven to have occurred at the Club. The remedial steps required herein are directly related to what the trial evidence showed were the mechanisms by which the patterns and practices of gender discrimination were implemented: Such steps, therefore, are well within this Court's discretion. *See Perez* v. *Boston Housing Authority*, 379 Mass. 703 (1980); *Commonwealth* v. *Adams*, 416 Mass. 558 (1993).

to be included regarding Club governance structure, it shall include but not be limited to: the bylaws of the Club; a description of the rights and privileges accruing to Bondholders in the Club and how one may obtain and hold such a bond; information concerning committees and boards, including but not limited to the names and functions of any and all committees and boards, the process by which one becomes a member of such committees and boards, the rules governing the actions of said committees and boards, the process by which one files a complaint with said committees and board, the process by which one becomes involved in a hearing before or with said committees and boards, the rules governing the conduct of such hearings, and the process by which one may appeal the rulings of said committees and boards. With respect to information regarding golfing privileges including tee times, tournament participation, and use of facilities, the handbook shall include but not be limited to golf rules, regulations, tee times, tee time access per membership category, description of golfing rights accruing to each membership category, and description of the rights of members to play in Club sponsored tournaments. Said handbook shall be mailed annually to all members of the Club, regardless of membership category, and additional copies shall be kept on file in the administrative offices of the Club for access by members and prospective members upon reasonable request.

2. Within sixty (60) days of the entry of this Order, the Club shall establish in writing an application policy and an application review procedure for new membership in the Club and for transfer of membership. This application policy and procedure shall be disclosed in writing to members and prospective members and shall be utilized by Club employees who deal with the public and with Club members. Said policy and procedure shall include the information required to be provided over the telephone and in writing before any fees are paid to the Club.

3. Within sixty (60) days of the entry of this Order, the Club shall create and utilize application forms that clearly and conspicuously identify and describe each membership category, including but not limited to a description of all applicable privileges, benefits, and restrictions applicable to each respective membership category.

4. Within ten (10) days after each Board of Governors' meeting, the Club shall mail copies of the Board of Governors' minutes to each member of the Club. In the case of Family Memberships, copies of the Board of Governors' minutes shall be addressed and mailed to both the Primary and Limited members, even if both have the same mailing address. This shall not eliminate the requirement that the Club provide written notification regarding changes in membership.

5. The Club shall provide written notice of all meetings of the Bondholders, Board of Governors, and Committees of the Club, no later than seven (7) days prior to such meetings, stating the time and place of the meeting, as well as the agenda of purpose of the meeting.

6. All meetings shall be open to all members of the Club, regardless of category of membership, and regardless of whether such member is entitled to vote at said meeting.

7. Within sixty (60) days of the entry of this Order, the Club shall establish

written rules governing the access to the golf course for each respective category of membership offered by the Club. Such rules shall also include equal access and opportunities to golf for both female and male Primary members, and shall not deny female Primary members access to the golf course as a result of restrictions relating to any gender based tournaments, unless males are restricted on a equal number of days and hours and corresponding days of the week, as female Primary members due to gender based tournaments.

8. Within sixty (60) days of the entry of this Order, the Club shall establish written rules that provide all Limited members a description of the basis under which they can play during Primary times, as guests or otherwise. Said rules shall be no more restrictive than the rules imposed upon Junior or Social members.

### D. COURT SUPERVISION

1. This Court shall oversee the Club's compliance with all of the provisions of this Order by holding periodic compliance review hearings. The first such hearing will be on Monday, July 10, 2000 at 2:00 p.m. in my assigned session in Middlesex Superior Court.

### E. TRAINING

1. Within six (6) months of the entry of this Order, the Club, shall provide training to all members of the Board of Governors and Chairpersons of Committees established by the Board of Governors, and all management employees of the Club. Management employees shall include but not be limited to the General Manager, Administrative office staff, and the Club Professional. Said training shall consist of twelve (12) hours: six (6) hours on gender discrimination, conducted by a firm or individual selected by the Office of the Attorney General, and six (6) hours on fiduciary obligations of officers and directors of non-profit organizations, similarly conducted by a firm or individual selected by the office of the Attorney General.

2. All individuals required to attend such training shall be informed by the Club in writing of the time and location of the training at least ten (10) days before the training is to commence.

3. Attendance of the above-referenced individuals is mandatory, and there shall be a sign-in sheet for the training, which shall thereafter be submitted by the Club to the Court at each periodic compliance review hearing.

4. Personnel referenced hereinabove are also to be trained by the Club regarding their record-keeping and reporting obligations under the terms of this Order, as well as any new policies and procedures that result from this Order.

5. The costs of all training required by this Order shall be paid by the Club.

### F. REPORTING AND RECORD KEEPING

1. Commencing Monday, February 7, 2000 and until further order of the Court, the Club shall maintain the following documents:
   a. A log containing each inquiry about membership or application for transfer at the Club, including but not limited to, each call, walk-in,

or written request for information relating to the Club's membership options, application process, change in membership status, and/or bond ownership. Such information shall include the name and gender of the person making the inquiry, the date and time of the inquiry, and a copy of any information provided by the Club in response to such inquiry.

b.  Copies of all applications for membership or transfer of membership status, separated by classification of membership sought.

c.  Copies of all waiting lists, including but not limited to the date each person listed applied for membership or transfer, the type of membership sought, the date the waiting list was produced, the date of admission of each member, and classification of membership given to such member by the Club.

d.  A report containing the name of each applicant for social and/or golf membership, the date the application and any fees were received by the Club, the date the Membership Committee took any action on such application, the date the Board of Governors took any action on such application, any correspondence or other oral or written communications to or from the applicant, and the status of each applicant. The report shall be updated as new members are accepted at the Club.

e.  Minutes of all of the Board of Governors and all Committees of the Club, including the names and votes of those individuals who voted in favor or in opposition to any issue presented for vote.

A PROVEN VIOLATION OF ANY PROVISION OF THIS PERMANENT INJUNCTION SHALL CONSTITUTE CONTEMPT OF COURT.


John C. Cratsley
Justice of the Superior Court

DATED: January 24, 2000